Paul H. COPLIN, et ux., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 517–81T.

United States Claims Court.

July 30, 1984.

See also 1 Cl.Ct. 144.

Andrew C. Barnard, Miami, Fla., with whom was Beverly B. Parker, Miami, Fla., for plaintiffs. David J. Kiyonaga and Michael C. Pierce, Balboa, Republic of Panama, of counsel.

Mary M. Abate, Washington, D.C., with whom were Asst. Atty. Gen. Glenn L. Archer, Jr., and Theodore D. Peyser, Washington, D.C., for defendant.

OPINION

KOZINSKI, Chief Judge.

Paul H. Coplin [1] is a United States citizen employed by the Panama Canal Commission. He claims a refund of all United States taxes paid on income derived from his employment with the Commission during 1979. Plaintiff bases his claim on Article XV of the Agreement in Implementation of Article III of the Panama Canal Treaty. He claims that this provision exempts all U.S. citizens from taxation of income derived by virtue of their employment with the Commission. The parties have submitted the case for decision on cross-motions for summary judgment.

**Facts [2]**

On September 7, 1977, after many years of negotiation, the United States and the Republic of Panama signed the Panama Canal Treaty, T.I.A.S. No. 10030 [hereinafter cited as Panama Canal Treaty], and the Treaty Concerning the Permanent Neutrality and Operation of the Panama Canal, T.I.A.S. No. 10029.[3] The Panama Canal Treaty superseded certain existing treaties between the United States and the Republic of Panama, particularly the Isthmian Canal Convention of November 18, 1903. 33 Stat. 2234, T.S. No. 431. Under the terms of the 1903 Convention, Panama had granted to the United States, in perpetuity, not only the right to build the canal, but exclusive sovereign rights over the ten-mile-wide zone traversed by the canal.

The Panama Canal Treaty restored to Panama territorial sovereignty over the Canal Zone. Panama, in turn, granted to the United States the right to manage, operate and maintain the canal until the year 2000. Operation of the canal during this period is entrusted to the Panama Canal Commission, an agency of the United States. The treaty provides for increasing participation by the Republic of Panama in the management and defense of the canal, in preparation for its assumption of full responsibility for the canal's operation upon expiration of the treaty.

Because the Canal Zone would no longer be subject to United States territorial sovereignty, it was necessary to define the rights and legal status of the Commission and its employees vis-a-vis each country. These matters were to be governed by the Agreement in Implementation of Article III of the treaty. Agreement in Implementation of Article III of the Panama Canal Treaty, Sept. 7, 1977, United States-Panama, T.I.A.S. No. 10031 [hereinafter cited as Implementation Agreement]. The Implementation Agreement contains 21 articles governing such subjects as use of land and water areas, use of housing areas, telecommunications, entry and departure, registration of vehicles, exemption from import duties and criminal jurisdiction.[4] Article XV of the agreement deals with taxation of the Commission, its contractors and subcontractors, and its United States citizen employees and their dependents:

**ARTICLE XV**

**Taxation**

1. By virtue of this Agreement, the Commission, its contractors and subcontractors, are exempt from payment in the

---

1. Patricia Coplin is named as a plaintiff because she signed a joint income tax return with her husband.

2. The background facts, which are not in dispute, are elegantly summarized in a portion of defendant's brief that the court has adopted with only minor revisions.

3. The Neutrality Treaty provides for both parties to defend the canal and to keep it open to the ships of all nations.

4. The legal status of United States armed forces in the Republic of Panama is governed by the Agreement in Implementation of Article IV of the Panama Canal Treaty. *See* p. 137 & n. 22 *infra.*

Republic of Panama of all taxes, fees or other charges on their activities or property.

2. *United States citizen employees and dependents shall be exempt from any taxes, fees, or other charges on income received as a result of their work for the Commission.* Similarly, they shall be exempt from payment of taxes, fees or other charges on income derived from sources outside the Republic of Panama.

3. United States citizen employees and dependents shall be exempt from taxes, fees or other charges on gifts or inheritance or on personal property, the presence of which within the territory of the Republic of Panama is due solely to the stay therein of such persons on account of their or their sponsor's work with the Commission.

4. The Coordinating Committee may establish such regulations as may be appropriate for the implementation of this Article. [Emphasis added.]

On September 16, 1977, President Carter transmitted the two treaties to the Senate for its advice and consent. The Agreements in Implementation of Articles III and IV of the Panama Canal Treaty were not formally referred to the Senate, although they were transmitted and considered during the ratification hearings. The treaties were approved by the Senate subject to a variety of amendments, conditions, reservations and understandings. Staff of Senate Comm. on Foreign Relations, 96th Cong., 1st Sess., *Senate Debate on the Panama Canal Treaties: A Compendium of Major Statements, Documents, Record Votes and Relevant Events* 410–14, 493–96 (Comm.Print 1979) [hereinafter cited as *Senate Debate on the Panama Canal Treaties*]. Panama assented to each of these, *id.* at 549–52, 556–60, and the treaties went into effect on October 1, 1979.

## Issues Presented

Plaintiff reads paragraph 2 of Article XV of the Implementation Agreement as exempting him from U.S. taxation of income he earned as an employee of the Panama Canal Commission. Defendant argues that the Implementation Agreement cannot exempt plaintiff from U.S. taxation because the President is without power to create exemptions to the tax laws by means of an executive agreement not subject to the advice and consent of the Senate. Defendant also argues that even if Article XV could exempt plaintiff from income tax it does not in fact do so because it was intended to bar only Panama, and not the United States, from taxing Commission employees.

## Discussion

### I.

### Nature and Effect of the Implementation Agreement

#### A.

It is a rare case indeed where the United States takes the position that the President has exceeded his authority in the area of foreign relations. The implications of this argument, where it casts doubt on the validity of an agreement between our government and that of another country, are potentially quite serious. An examination of the Panama Canal Treaty and related documents reveals that the Implementation Agreement formed an integral aspect of the deal we struck with Panama. Article 111(9) of the treaty provides:

The use of the areas, waters and installations with respect to which the United States of America is granted rights pursuant to this Article, and the rights and legal status of United States Government agencies and employees operating in the Republic of Panama pursuant to this Article, shall be governed by the [Implementation Agreement] signed this date.

The Implementation Agreement thus plays a key role in defining the mutual rights and obligations of the United States and Panama with respect to the operation of the canal. Nevertheless, defendant appears to argue that the Implementation Agreement is void to the extent that it provides what plaintiff says it does.

It is difficult to find a more eloquent description of the calamitous foreign policy implications of defendant's position than de-

fendant's own brief in *Weinberger v. Rossi,* 456 U.S. 25, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982). *Weinberger* considered the validity of a Base Labor Agreement (BLA) signed by the President with the government of the Philippines. The agreement, which was not ratified by the Senate, gave Filipino citizens preferential consideration for civilian positions on U.S. military bases in the Philippines. The D.C. Circuit had held that the BLA was repealed by a subsequent Act of Congress. In arguing for reversal, the government noted that the ruling below

> would impliedly "repeal" this Nation's commitment to the Philippines—given in exchange for that country's granting the United States the right to use military facilities located in the Philippines.... Such an implied "repeal," however, notwithstanding whatever effect it may have for *domestic* purposes, would have no effect upon the United States' binding *international* obligation under the BLA to prefer Filipino citizens for civilian employment on the bases. See L. Henkin, [*Foreign Affairs and the Constitution* 164 (1972) ]; [2] C. Hyde, [*International Law Chiefly as Interpreted and Applied by the United States* 1465 (2d rev. ed. 1945) ]; *Restatement (Second) of the Foreign Relations Law of the United States* ... § 145(2).
>
> ... Affirmance of the decision below thus would require the United States to breach what the Philippines views as a key provision of the BLA, with unpredictable consequences for our relations with that country and for the United States' continued use of military facilities located there.
>
> ... It is even more difficult to predict the consequences that a breach of the BLA by the United States would have on its relations with ... other countries and on the continued availability to the United States of the military facilities located there. One fair assumption, however, is that the court of appeals' decision, unless reversed, undoubtedly will hamper the United States' ability to negotiate for and maintain base rights and other mili-

tary advantages in the Philippines and elsewhere.

Brief for the Petitioners at 29–31, *Weinberger v. Rossi,* 456 U.S. 25, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) (emphasis original; footnotes omitted) [hereinafter cited as *Weinberger* Brief]. The Supreme Court found these arguments persuasive.

In light of these weighty considerations, it is at the very least surprising for the United States now to take the position that the court ought to ignore the terms of the Implementation Agreement because, if it means what plaintiff suggests, the President was acting ultra vires in agreeing to it. Defendant can, of course, argue that plaintiff's interpretation of the agreement is incorrect. That argument is addressed at length below. *See* pp. 125–149 *infra.* That is quite different, however, from suggesting that the court need not even bother construing the disputed paragraph because the President lacked the authority to bind the United States to its terms.

■ Were the court to accept defendant's argument, the consequences would be no less "unpredictable" than those catalogued so persuasively by the United States in *Weinberger.* The Implementation Agreement is an integral part of a very complex series of arrangements defining the relationship between our country and another; it concerns the Panama Canal, a waterway crucial to trade in peacetime and defense in case of war. *See* S.Exec.Rep. No. 12, 95th Cong., 2d Sess. 77–79, 91, 178–80 (1978) [hereinafter cited as S.Exec. Rep. No. 12]. A ruling that the President lacked authority to bind the United States to a portion of the Implementation Agreement would not, as the government pointed out in *Weinberger,* relieve the United States of its *international* obligation to comply with its terms. *See* 2 C. Hyde, *International Law Chiefly as Interpreted and Applied by the United States* 1465 (2d rev. ed. 1945) [hereinafter cited as Hyde, *International Law* ]; Vienna Convention on the Law of Treaties, art. 27, U.N. Doc. A/CONF. 39/27 (1969), *reprinted in* 63

Am.J.Int'l L. 875, 884 (1969) [hereinafter cited as Vienna Convention].[5] If Panama were to consider its interests impaired by such a ruling, it could take steps that would adversely affect our interests.[6] Similarly, our relationship with other countries could suffer. In the words of the *Weinberger* Brief, "[o]ne fair assumption ... is that ... [it] will hamper the United States' ability to negotiate" future international agreements.

### B.

■ Fortunately, the court need not confront these unsettling issues because the President had ample authority to bind the United States to all terms of the Implementation Agreement. *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), established—if doubt existed before—that the President has significant powers to bind the United States to international agreements without the advice and consent of the Senate. Such agreements supersede prior United States law to the extent it is inconsistent. In *Dames & Moore*, for example, the President had signed executive agreements known as the Algiers Accords abrogating the rights of United States nationals to sue the government of Iran in our courts. The Supreme Court ruled that the President's

action "effected a change in the substantive law." *Id.* at 685, 101 S.Ct. at 2989. While the Court noted that the abrogation of existing rights might constitute a taking, *id.* at 688–90, 101 S.Ct. at 2991–92, it upheld the President's authority to unilaterally change domestic law by executive agreement with a foreign state, *see id.* at 685–86, 101 S.Ct. at 2989–90; *accord United States v. Pink*, 315 U.S. 203, 230, 62 S.Ct. 552, 565, 86 L.Ed. 796 (1942) (international compacts and agreements are the " 'Law of the Land' under the supremacy clause"); *United States v. Belmont*, 301 U.S. 324, 330–31, 57 S.Ct. 758, 760–61, 81 L.Ed. 1134 (1937) (same).

■ Of course, the President's power to unilaterally dislocate domestic law is not without bounds. In *Dames & Moore*, the Court carefully reviewed the validity of the President's action by applying the classic analysis of Mr. Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634, 72 S.Ct. 863, 888, 96 L.Ed. 1153 (1952). It noted that the President signed the Algiers Accords with the knowledge and approval of Congress. "In such a case," the Court held, "the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and

---

5. As defendant has noted, "[a]lthough the Vienna Convention is not yet in force for the United States, it has been recognized as an authoritative source of international treaty law by the courts ... and the executive branch." *Weinberger* Brief at 16 n. 9 (citations omitted).

6. While the *Weinberger* Brief left somewhat vague the potential consequences of a breach of an executive agreement, the Department of State has been more explicit, recognizing that the other signatory might be entitled to repudiate the agreement, depriving the United States of its benefits thereunder. For example, in 1957 the Department of State commented on H.R. 8704 (the Kilday resolution), which would have prohibited the President from delivering U.S. soldiers who had committed crimes abroad for trial by the host country. The Kilday resolution would have superseded certain Status of Forces Agreements that had been negotiated by the President without the advice and consent of the Senate. The Department of State argued against the Kilday resolution, noting as follows:

But the greater danger is that our Allies might consider our actions pursuant to H.R. 8704 as in direct violation of our treaties and agreements and consider themselves no long-

er bound by their provisions. In that case not only would the foreign government have full jurisdiction over our servicemen for all offenses, but we would not have the benefit of any of the other provisions of our agreements which provide for special privileges with respect to such matters as drivers' licenses, exemption from taxation, postal services, procurement of supplies, visas, and the adjudication of civil claims against our forces.

. . . .

... This effect would be magnified if the foreign nations regarded our failure to abide by our agreement as a repudiation of the criminal jurisdiction provisions of the Status of Forces Treaty and similar agreements. In such an eventuality, the foreign state would be fully entitled under international law to try in their own courts *all* criminal offenses committed by the members of our armed forces within their territorial limits and we would have no legal right to prevent them from so doing.

Murphy, *Views of Department of State on House Resolution 8704*, 37 Dep't St.Bull. 317, 319–21 (1957) (emphasis original).

the burden of persuasion would rest heavily upon any who might attack it.' " *Dames & Moore*, 453 U.S. at 668, 101 S.Ct. at 2981 (quoting *Youngstown Sheet & Tube*, 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring)). The Court therefore upheld the President's action even though the Algiers Accords were not formally approved by the Senate pursuant to article II, section 2 of the Constitution.

■ It is difficult to imagine a case where the President's power to bind the United States by executive agreement would be less subject to challenge. Article III of the treaty refers to the Implementation Agreement, providing that it "shall govern the rights and legal status of United States Government agencies and employees operating in ... Panama." The Foreign Relations Committee specifically noted that the Implementation Agreement "will be entered into pursuant to the authority of [the] treaty." S.Exec.Rep. No. 12, at 75.[7] The text of the agreement was submitted to the Senate for its review and the Senate in fact gave it careful consideration. *See, e.g., Panama Canal Treaties: Hearings Before the Senate Comm. on Foreign Relations*, 95th Cong., 1st Sess. Part 1, at 268–69 (1977); Part 3, at 702–11 (1977); Part 5, at 117–21 (1978) [hereinafter cited as *Treaty Hearings*]. The Report of the Foreign Relations Committee recommending ratification of the treaties summarized and discussed the Implementation Agreement and other related documents. S.Exec.Rep. No. 12, at 34–35. There is no doubt that, in consenting to the ratification of the Panama Canal Treaty, the Senate considered and approved the Implementation Agreement and intended that it go into effect under the authority of the treaty.

■ The principles governing this issue are so well established that citation of further authority would be superfluous were there not a Supreme Court case squarely on point. *Wilson v. Girard*, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed. 1544 (1957), considered whether "an Administrative Agreement covering, among other matters, the jurisdiction of the United States over offenses committed in Japan by members of the United States armed forces" was valid. *Id.* at 527, 77 S.Ct. at 1410. The agreement was authorized by a provision in a treaty with Japan that was almost identical to the relevant language of Article III of the Panama Canal Treaty. Security Treaty, Sept. 8, 1951, United States-Japan, art. III, 3 U.S.T. 3329, T.I.A.S. No. 2491. As in this case, the agreement was signed and submitted to the Senate for its review during the ratification process. The Court held:

> In the light of the Senate's ratification of the Security Treaty after consideration of the Administrative Agreement, which had already been signed, and its subsequent ratification of the NATO Agreement, with knowledge of the commitment to Japan under the Administrative Agreement, we are satisfied that the approval of Article III of the Security Treaty authorized the making of the Administrative Agreement and the subsequent Protocol embodying the NATO Agreement provisions governing jurisdiction to try criminal offenses.

*Wilson v. Girard*, 354 U.S. at 528–29, 77 S.Ct. at 1411–12.

The position urged by defendant appears to be squarely in conflict with this established body of Supreme Court caselaw.[8] The only authority defendant cites in support of its position is *Security Pacific National Bank v. Iran*, 513 F.Supp. 864, 872 (C.D.Cal.1981). *Security Pacific* ad-

---

7. Treaties, like other laws, can form the basis of the President's authority to enter into executive agreements with other states. *Wilson v. Girard*, 354 U.S. 524, 526–29, 77 S.Ct. 1409, 1410–12, 1 L.Ed. 1544 (1957); *see also Dole v. Carter*, 444 F.Supp. 1065, 1068 (D.Kan.), *motion for injunction denied*, 569 F.2d 1109 (10th Cir.1977); Restatement (Second) of the Foreign Relations Law of the United States § 119 (1965); Cong. Research Serv., *The Constitution of the United States of America—Analysis and Interpretation*, S.Doc. No. 82, 92d Cong., 2d Sess. 509–11 (1973).

8. Defendant's position also appears to be contrary to the position it has taken in other cases. *See, e.g.,* Brief for the Federal Respondents at 41–43, 50–53, *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

dressed the issue that was eventually presented to the Supreme Court in *Dames & Moore* and appears to have reached the same conclusion. Of course, if there were an inconsistency between *Security Pacific* and *Dames & Moore,* there can be no doubt as to which case controls. If defendant knows how its position here can be squared with the Supreme Court's rulings in cases such as *Dames & Moore* and *Wilson v. Girard,* it has failed to articulate its rationale to this court or to other courts, some of which have accepted defendant's argument. *See Hollowell v. United States,* No. 82–713–ORL–CIV–EK, slip op. at 4 (M.D.Fla. Nov. 21, 1983); *Swearingen v. United States,* 565 F.Supp. 1019, 1021 (D.Colo. 1983); *see also Long v. United States,* No. 83–158, slip op. at 4–5 (D.Or.July 22, 1983) (relying in part on *Swearingen* ).[9]

▇ The Implementation Agreement is the paradigm of presidential action in the area of foreign relations supported by specific congressional authorization. It is therefore entitled to "the strongest of pre-

sumptions and the widest latitude of judicial interpretation." *Youngstown Sheet & Tube,* 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring). It has the force and effect of law. *Accord Watson v. United States,* 592 F.Supp. 701, 705 (W.D. Wash.1983).

▇ Since the Implementation Agreement has the force of law, it implicitly repeals prior conflicting laws. *See, e.g., Dames & Moore,* 453 U.S. at 685, 101 S.Ct. at 2989; *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); *Polos v. United States,* 621 F.2d 385, 223 Ct.Cl. 547, 560–61 (1980); *Nebraska Public Power District v. 100.95 Acres of Land,* 719 F.2d 956, 958 (8th Cir.1983). In the area of income taxation, however, there is a statutory mechanism that makes it unnecessary to rely merely upon repeal by implication. *See* 26 U.S.C. § 894(a) (1982). This section provides that "gross income" shall not include any income excluded "by any treaty obliga-

---

**9.** Litigants have an obligation to research the law and to base their arguments on existing precedent or to suggest reasonable departures from precedent. *See St. Paul Fire & Marine Insurance Co. v. United States,* 4 Cl.Ct. 762. 770 (1984); Model Rules of Professional Conduct Rule 3.1 (1983). A party may not ignore apparently controlling authority while urging a court to rule in a manner inconsistent therewith. The court is therefore troubled by defendant's failure to discuss—or even cite—*Dames & Moore* and other relevant cases in its presentation to this court and to other courts that have considered this issue. *See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment at 11–15, *Rego v. United States,* 591 F.Supp. 123 (W.D.Tenn.1984); Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 11–15, *Harris v. United States,* 585 F.Supp. 862 (S.D.Ga.1984); Memorandum of Law in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment at 11–15, *Stabler v. United States,* No. CA3–83–0166–R (N.D.Tex. Nov. 30, 1983); Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 11–15, *Hollowell v. United States,* No. 82–713–ORL–CIV–EK (M.D.Fla. Nov. 21, 1983); Memorandum of Law in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment at 11–15, *Pierpoint*

*v. United States,* No. 83–0354–2 (D.S.C. Oct. 3, 1983); Opposition to Plaintiffs' Cross-Motion for Summary Judgment at 11–15, *Snider v. United States,* No. C83–638V (W.D.Wash. Sept. 23, 1983); Memorandum of the United States in Support of its Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment at 12–15, *Long v. United States,* No. 83–158 (D.Or. July 22, 1983); Memorandum in Support of Defendant's Motion for Summary Judgment at 7–8 & Defendant's Reply to Plaintiffs' Opposition Memorandum at 3–4, *Swearingen v. United States,* 565 F.Supp. 1019 (D.Colo. 1983); Memorandum of the United States in Support of its Motion for Summary Judgment at 11–14, *Watson v. United States,* No. C82–319T (W.D.Wash. June 21, 1983); Pre-Trial Brief for the United States at 11–14 & Memorandum of the United States in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of its Cross-Motion for Summary Judgment at 11–14, *Stokes v. United States,* No. C82–160T (W.D.Wash. June 21, 1983); Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and Reply Memorandum in Support of Defendant's Motion for Summary Judgment at 8–12, *Corliss v. United States,* 567 F.Supp. 162 (W.D.Ark.1983); Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 11–15, *Highley v. United States,* 574 F.Supp. 715 (M.D.Tenn.1983); Memorandum Brief for Respondent at 10–11, *McCain v. Commissioner,* 81 T.C. 918 (1983).

tion of the United States." The term "treaty obligation" in section 894 is broad enough to include executive agreements that are signed by the President pursuant to constitutional or statutory authority.

As the Supreme Court recognized in *Weinberger v. Rossi,* "[t]he word 'treaty' has more than one meaning." 456 U.S. at 29, 102 S.Ct. at 1514. Under certain circumstances it may refer only to those international agreements formally entered into by the President and approved by the Senate pursuant to article II, section 2 of the Constitution. *Id.* at 30–31 & nn. 7 & 8, 102 S.Ct. at 1514–1515 & nn. 7 & 8. Frequently, however, when Congress uses the word "treaty" it is also referring to executive agreements that are not formally approved by the Senate and are therefore not article II treaties. *Id.* at 30–31, 102 S.Ct. at 1514–1515; *B. Altman & Co. v. United States,* 224 U.S. 583, 601, 32 S.Ct. 593, 597, 56 L.Ed. 894 (1912) ("a compact ... negotiated and proclaimed under the authority of [the] President ... is a treaty").

■ In *Weinberger v. Rossi,* the court determined that the word "treaty," as used in section 106 of Pub.L. No. 92–129, 85 Stat. 348, 355 (1971), was meant to include executive agreements. One basis for the Supreme Court's conclusion was that the statute in question did not affect the foreign policy of the United States. 456 U.S. at 31, 102 S.Ct. at 1515. In such circumstances, Congress is less likely to use the term "treaty" in a technical, restricted sense and "there is even more reason to construe Congress' use of 'treaty' to include international agreements as well as Art. II treaties." *Id.* Like the statutes in *Weinberger* and *Altman,* section 894 does not directly concern foreign policy and therefore the term "treaty" is likely to have been used in its broader, less technical sense.

Moreover, at the time section 894 was first enacted [10] there were a number of international agreements pertaining to taxation that had been negotiated by the President pursuant to statutory authorization but without Senate approval. *See, e.g.,* Agreement Providing for Relief from Double Income Tax on Shipping Profits, Aug. 24, 1933-Jan. 9, 1934, United States-Ireland, 48 Stat. 1842, E.A.S. No. 56; Agreement Providing for Relief from Double Income Tax on Shipping Profits, Mar. 31-June 8, 1926, United States-Japan, 47 Stat. 2578, E.A.S. No. 3. The practice has continued over the years with the apparent approval of Congress. *See, e.g.,* Agreement Regarding Double Taxation of Aircraft Earnings, Dec. 29-Dec. 31, 1975, United States-Chile, 27 U.S.T. 1371, T.I.A.S. No. 8252; Agreement Regarding Relief from Double Taxation on Earnings from Operation of Ships and Aircraft, Dec. 21-Dec. 27, 1962, United States-Iceland, 13 U.S.T. 3827, T.I.A.S. No. 5255. In *Weinberger,* the Court noted the existence of such international agreements and concluded that Congress would not have intended to repeal them by implication in passing the legislation there in question. It therefore read the term "treaty" broadly. Similarly, section 894 ought to be read broadly to avoid conflict between the income tax laws and these otherwise valid executive agreements.

■ Given that the legislative history of section 894 and its predecessor shed absolutely no light on the subject, these considerations lead to the conclusion that the term "treaty" in section 894 ought to be read to include executive agreements such as the Implementation Agreement here in issue.

## II.

### Interpretation of Article XV of the Implementation Agreement

#### A.

#### The Language and Its Plain Meaning

■ 1. Treaties and other international agreements are contracts between sover-

---

**10.** Section 894 was originally enacted as section 22(b)(7) of the Revenue Act of 1936. Pub.L. No. 74–740, 49 Stat. 1648, 1658 (1936). It was recodified as section 894 at the time of the 1954 revision of the Income Tax Code. The section was amended in 1966 in a manner not relevant to the point here in issue.

eign states. *Santovincenzo v. Egan*, 284 U.S. 30, 40, 52 S.Ct. 81, 84, 76 L.Ed. 151 (1931); *Geofroy v. Riggs*, 133 U.S. 258, 271, 10 S.Ct. 295, 298, 33 L.Ed. 642 (1890). In interpreting such documents, the court must divine and give effect to "the intention of the two governments." *United States v. Texas*, 162 U.S. 1, 36, 16 S.Ct. 725, 732, 40 L.Ed. 867 (1896). Therefore, while international agreements have the force and effect of law, they must be construed more like contracts than like statutes,[11] for the court must consider the interests and intentions of both parties "to secure equality and reciprocity between them." *Jordan v. Tashiro*, 278 U.S. 123, 127, 49 S.Ct. 47, 48, 73 L.Ed. 214 (1928); *Geofroy v. Riggs*, 133 U.S. at 271, 10 S.Ct. at 298. *See The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 32–33, 5 L.Ed. 191 (1821). Professor Bishop has noted as follows:

> Even though we may come to speak of multilateral treaties as "international legislation", and they do have many characteristics of legislation in that such treaties make law for those states which become parties to them, we must never forget that international agreements remain basically and fundamentally just that: *agreements*, or contracts between two or more states.

Bishop, *Reservations to Treaties*, 103 Recueil des Cours 245, 255 (1962) (emphasis original) [hereinafter cited as Bishop].

"Interpretation of [a treaty] must, of course, begin with the language of the Treaty itself." *Sumitomo Shoji America,* *Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982). Indeed, "[t]he clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" *Id.* (quoting *Maximov v. United States*, 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963)).[12] In construing treaties, words "are to be taken in their ordinary meaning ... and not in any artificial or special sense impressed upon them by local law." *Geofroy v. Riggs*, 133 U.S. at 271, 10 S.Ct. at 298; *accord Santovincenzo*, 284 U.S. at 40, 52 S.Ct. at 84; *see* Vienna Convention art. 31, 63 Am.J.Int'l L. 885.

Perhaps the simplest and most direct guidance as to how a treaty must be construed comes from Mr. Chief Justice Hughes, who noted as follows:

> [I]t is our duty to interpret [a treaty] according to its terms. These must be fairly construed, but we cannot add to or detract from them.

*Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 11, 57 S.Ct. 100, 103, 81 L.Ed. 5 (1936).

2. Paragraph 2 of Article XV of the Implementation Agreement speaks in clear and sweeping terms. It provides that "United States citizen employees [of the Panama Canal Commission] ... shall be exempt from any taxes ... on income received as a result of their work for the

---

11. As noted by Chancellor Kent over a century ago:

> Treaties of every kind, when made by the competent authority, are as obligatory upon nations as private contracts are binding upon individuals; and they are to receive a fair and liberal interpretation, according to the intention of the contracting parties, and to be kept with the most scrupulous good faith. Their meaning is to be ascertained by the same rules of construction and course of reasoning which we apply to the interpretation of private contracts.

1 J. Kent, *Commentaries on American Law* \* 174, *cited with approval in Tucker v. Alexandroff*, 183 U.S. 424, 437, 22 S.Ct. 195, 200, 46 L.Ed. 264 (1902); *accord Sullivan v. Kidd*, 254 U.S. 433, 439, 41 S.Ct. 158, 160, 65 L.Ed. 344 (1921).

12. The International Court of Justice has taken the same view:

> The Court considers it necessary to say that the first duty of a tribunal which is called upon to interpret and apply the provisions of a treaty, is to endeavor to give effect to them in their natural and ordinary meaning in the context in which they occur. *If the relevant words in their natural and ordinary meaning make sense in their context, that is an end of the matter.*

Competence of the General Assembly for the Admission of a State to the United Nations, 1950 I.C.J. 4, 8 (Advisory Opinion of Mar. 3) (emphasis added).

Commission." This language stands in sharp contrast with that of paragraph 1 of the same article which provides that the Commission itself shall be "exempt from payment *in the Republic of Panama* of all taxes." (Emphasis added.) Paragraph 3 of the same article, dealing with personal property, gift and inheritance taxes of U.S. citizen employees, displays a similar contrast, providing that their "presence ... *within the territory of the Republic of Panama* ... due solely ... [to] their ... work with the Commission" shall not serve as a basis for the exercise of taxing jurisdiction. (Emphasis added.) Finally, Article XV is titled simply "Taxation" and not "Panamanian Taxation" as one would expect if its subject were limited as defendant suggests. By contrast, Article IX, which provides that the Commission shall give preference to supplies and services obtainable in Panama, is titled "Acquisition of *Panamanian* Supplies and Services." (Emphasis added.) When defining rights and responsibilities of only one of the signatory states, the drafters apparently knew how to so provide.

It is also instructive that when addressing the subject of taxation elsewhere in the treaty documents, the parties were careful to specify which country's taxes were meant. For example, paragraph 9 of Article IX of the treaty provides that vessels passing through the canal "shall be exempt from any taxes ... by the Republic of Panama." Similarly, paragraph 2(e) of Article XI of the Implementation Agreement, dealing with United States contractors of the Commission, provides that such contractors "shall not be obliged to pay any tax ... to the Republic of Panama" so long as they are taxed in the United States at a substantially equivalent rate. This is an agreement drafted by sophisticated parties, obviously capable of using precise language.

The Supreme Court has held that "general principles applicable to the construction of written instruments" apply to the construction of treaties. *Tucker v. Alexandroff,* 183 U.S. 424, 436, 22 S.Ct. 195, 200, 46 L.Ed. 264 (1902). Specifically, "the enumeration of certain powers with respect to a particular subject matter is a negation of all other analogous powers with respect to the same subject matter.... The rule is curtly stated in the familiar legal maxim, *expressio unius est exclusio alterius." Id.* The fact that Article XV, according to its heading, purports to deal with the general subject of taxation, that two of its paragraphs specifically refer to the imposition of taxes by Panama only, and that the parties were careful elsewhere in the treaty to specify the taxing authority being addressed, all support plaintiff's interpretation of paragraph 2. Indeed, a fair reading of the language in question leads to the conclusion that it unambiguously exempts U.S. citizens who are Commission employees from taxation by Panama as well as the United States. *Accord Harris v. United States,* No. CV 183–077, slip op. at 3 (S.D.Ga. Mar. 21, 1984), *appeal docketed,* No. 84–8424 (11th Cir. May 18, 1984); *Swearingen,* 565 F.Supp. at 1020.[13]

### B.

### The Position of the United States

Defendant argues that the treaty language should not be construed in accordance with its plain meaning because to do so would do violence to the intention of the signatories. A court ought not, of course, give literal effect to treaty language if it is persuaded that such language does not reflect the intention of the high contracting parties. *See, e.g., Sumitomo Shoji,* 457 U.S. at 180, 102 S.Ct. at 2377; *Great-West Life Assurance Co. v. United States,* 678 F.2d 180, 230 Ct.Cl. 477, 481 (1982); Vienna Convention art. 32, 63 Am.J.

---

**13.** Defendant's position that the language of Article XV is ambiguous is not entirely unlike that adopted by one of Lewis Carroll's characters: " 'When *I* use a word', Humpty Dumpty said, in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.' " *Through the Looking Glass,* in The Complete Works of Lewis Carroll 121, 196 (1939), *quoted with approval in Tennessee Valley Authority v. Hill,* 437 U.S. at 173 n. 18, 98 S.Ct. at 2291 n. 18.

Int'l L. 885. On the other hand, the court may not simply rewrite the contract to achieve an end it deems desirable. *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943). Where the language is reasonably clear, the party proffering a contrary interpretation must persuade the court that its construction comports with the view of *both* parties. *See United States v. Texas,* 162 U.S. at 36, 16 S.Ct. at 732; *see also Sumitomo Shoji,* 457 U.S. at 180, 102 S.Ct. at 2377 (plain meaning of the treaty controls unless it is inconsistent "with the intent ... of its signatories"). If the court has doubt about the intention of one of the signatories, it cannot ignore the language of the instrument. Absent convincing evidence to the contrary, the court will presume that a party—particularly one of some sophistication like a sovereign state—understood and agreed to the language as written.

Defendant raises three arguments in support of its contention that Article XV was meant to bar only Panama and not the United States from taxing Commission employees. First, it asserts that Panama could have no interest in whether the United States taxes its citizens who work for the Panama Canal Commission. To support this contention, it relies on the negotiating history of Article XV and on the "common sense" notion that the United States would not bargain with other countries as to when and how it will tax its own citizens.

Next, defendant argues that its interpretation is entitled to significant, perhaps controlling, weight. It supports this argument by reference to a number of Supreme Court opinions that, indeed, stand for the proposition that courts ought to afford substantial deference to interpretations of treaties by agencies of the Executive Branch.

Finally, defendant argues that the United States Senate intended Article XV to operate only against Panama and not the United States. It points to the legislative history of the ratification proceedings and suggests that Article XV ought to be interpreted so as to reflect the intention of Congress as expressed during its deliberations.

The court considers each of these arguments in turn.

## 1. The Negotiating History

a. Before delving into the negotiating history, the court notes that the record presented poses considerable obstacles to a determination of what the parties intended when they agreed to Article XV of the Implementation Agreement. Defendant has produced parts of 18 documents (apparently all previously classified) consisting of telegrams, speech outlines, transcripts of negotiating sessions and State Department memoranda, all concerning negotiations between the United States and Panama on the subject of taxation of United States citizens employed by the Panama Canal Commission. The documents cover the period from June 30 to August 12, 1977, the latter date being marked by correspondence from President Carter to Congress advising that our negotiators had tentatively reached agreement with Panama on all terms of the treaties and related documents. Defendant informs the court that these are all of its contemporaneous negotiating records pertaining to what eventually became Article XV of the Implementation Agreement. In addition, plaintiff has provided an affidavit from a Panamanian negotiator relating events at a negotiating session not mentioned in defendant's documents.

The materials presented leave many questions unanswered. For example, there is *no* contemporaneous evidence as to the meaning either party placed on the language of Article XV that is the subject of this controversy. Moreover, there is *no evidence whatsoever* as to the interpretation given this language by Panama. *But see* n. 16 *infra.* While the record provides valuable insights as to the interests and motivations of the parties, the court is left largely to surmise and conjecture as to how they resolved their differences and what

might have motivated each side to agree to the language finally adopted.

This is far from an ideal basis on which to resolve such a difficult and sensitive issue. The court therefore suggested that the record be supplemented at trial or through additional documentation. As is more fully discussed below, this suggestion was rejected. *See* pp. 42–44 *infra*. With some reluctance, therefore, the court examines the evidence presented to determine whether it supports defendant's assertion that the negotiating history is consistent with its interpretation of Article XV.

**b.** The record presented—sketchy though it be—paints a far more complex picture of what happened at the negotiating table than defendant's argument would suggest. It is clear that the United States and Panama held widely divergent views on the subject of taxation of Commission employees. Surprisingly, however, this was not principally a quibble over tax revenues. The dispute centered largely on a fundamental disagreement as to the nature and status of the Panama Canal Commission.

The United States viewed the Commission as an agency of the U.S. Government, much like other government agencies conducting U.S. Government business abroad. Our negotiators were concerned that acquiescing to demands that Panama be allowed to tax Commission employees would be tantamount to permitting taxation of the U.S. Government. They also feared that yielding on this issue could expose the United States to the demands of other governments that might wish to tax employees of U.S. agencies operating on their soil. This theme, which was echoed again and again, is perhaps best summarized by an excerpt from the statement of U.S. Ambassador Sol M. Linowitz during the June 30, 1977, negotiating session held in Washington, D.C.:

[O]n the Income Tax question which you raised with us ... I can tell you this: We have explored this carefully with the Treasury Department and with the legal people involved with the Internal Reve-

nue Service—and it does pose a very great problem.

This is not done anywhere in the world. No employee of a government, of the United States Government or of a government agency, is now subject to taxes in a foreign country; and it would therefore, call for a wholly new approach to this problem—which is being very strongly resisted.

Motion of the United States for Summary Judgment and Brief in Support Thereof at 48 (filed Nov. 22, 1983) [hereinafter cited as Defendant's Brief].

The Panamanians viewed the matter quite differently. To them, the Panama Canal Commission was not merely a United States agency conducting U.S. Government operations in Panama. They viewed the Commission as a commercial enterprise operated jointly by the two governments, fundamentally different from agencies performing purely governmental functions on behalf of the United States alone. This view was summarized by Ambassador Romulo Escobar Betancourt of Panama at the July 12, 1977, negotiating session:

Now, I understand the view that you put forward here yesterday ... that in your case there's no precedent anywhere in the world for this. But if I understood the argument advanced, there haven't been any cases either in which you've had an operation like this—a joint operation between two countries.

We're not talking about income tax to be paid by the military assigned to Panama; we're talking about income tax to be paid by citizens whose wages would be derived from the Panama Canal. In other words, the salaries to be paid by the U.S. nationals don't come from the United States but, rather, they would be derived from the operation of the Canal. So maybe they could be allowed to pay taxes in Panama since from here on they'll be working under Panamanian

jurisdiction and using Panamanian services.

Defendant's Brief at 73–74.[14]

An exchange from the July 14, 1977, negotiating session reveals that the Panamanian negotiators were uncomfortable with the U.S. view that operation of the canal would continue to be an exercise of U.S. sovereign authority within their territory:

**[Mr. Rodrigo] Gonzales [of Panama]:** ... [I]f the National Bank of Panama, an agency of the government, established a branch in the US, its Panamanian employees would be liable to pay American income tax. The same thing applies to foreign workers in Panama.... Another example is Volvo, a government-owned company, which has set up assembly plants in the US. Both its American and Swedish workers pay US income tax.

**[Ambassador Ellsworth] Bunker [of the United States]:** US government employees do not pay income tax anywhere in the world.

**[Minister Aristides] Royo [of Panama]:** We must recognize the changing situation, that this Zone will no longer be a place where American workers are subjected to US jurisdiction, laws, police and courts. The situation now will be one in which American workers, although employed by the American government, will be subjected to a foreign jurisdiction, police, as the colonial status will cease to exist.

Defendant's Brief at 79–80. Minister Royo's final comment suggests that the Panamanian position was animated at least in part by a desire to alter as much as possible the pre-treaty situation where the United States exercised full sovereignty in operating the canal.

As disclosed by a State Department briefing paper prepared on July 8, 1977, the United States was well aware of the motivations of the Panamanian negotiators and appreciated that this was not principally a dispute over revenues:

*Suggested Position and Strategy:*

We should not agree to taxation of U.S. citizen employees. Since taxation of U.S. employees would not yield very much in new revenues [remainder of sentence classified].

*Supporting Arguments:*

—Taxation of U.S. employees by a foreign country would be tantamount to taxation of the [U.S. Government]. This is not acceptable international practice.

—While it is international practice to tax employees of government trade organizations, airlines etc. on the basis that these enterprises fulfill a commercial function, government employees engaged in governmental activities are not taxed.

—Contrary to Panama's argument, we have always managed the waterway as a government—not a commercial—facility. Personnel policies, toll structures and financial practices reflect this. The Canal is, in effect, a government monopoly, not a commercial enterprise, and its employees should be treated accordingly.

---

**14.** The Panamanian position was not without support. While the Panama Canal Treaty and the Implementation Agreement refer to the Commission as an agency of the United States, Panama Canal Treaty art. III (3); Implementation Agreement art. I (1), its structure and operation differ in fundamental respects from the typical U.S. Government agency. For example, the Commission is supervised by a board composed of nine members, four of whom must be Panamanian nationals proposed by Panama. Panama Canal Treaty art. III(3)(a). The United States may not unilaterally remove any of the Panamanian members, but must reach agreement with Panama on any proposed removal. *Id.* art. III (3)(b). Upon removal of a Panamanian member, Panama may propose a replacement. *Id.* Until 1990, the Administrator of the Commission shall be an American and the Deputy Administrator a Panamanian. *Id.* art. III (3)(c). Starting in 1990 and until the treaty expires in the year 2000, the Administrator shall be Panamanian and the Deputy, American. *Id.* The treaty also provides for the appointment of a Panama Canal Consultative Committee, composed of an equal number of Americans and Panamanians, to advise the two governments on matters of policy affecting the canal. *Id.* art. III(7). In addition, the treaty calls for the employment of increasing numbers of Panamanian employees at all levels, "with the objective of preparing, in an orderly and efficient fashion, for the assumption by the Republic of Panama of full responsibility for the management, operation and maintenance of the Canal upon the termination of this Treaty." *Id.* art. III(8).

. . . .

*—Panama may be raising this as an issue to assert its "sovereign right" to tax persons resident within its jurisdiction. The money involved is not important to the [Government of Panama], but the principle is.* At current Panamanian tax rates, tax payments by US employees would total approximately $2 million per annum (average U.S. employee taxable income is $11,000+). [Remainder of paragraph classified.]

Defendant's Brief at 62–63 (emphasis added).

[Paragraph deleted from published version of opinion.] [15]

As the negotiations progressed, the positions of the parties hardened and their differences grew wider rather than narrower. As Ambassador Linowitz noted at the July 11, 1977, negotiating session, "these problems have been even intensified in our further discussions." Defendant's Brief at 56.

The last negotiating session for which we have a contemporaneous record was held on July 18, 1977, in Washington and there appears to have been no specific discussion of this issue. However, a memorandum from U.S. Ambassadors Bunker and Linowitz to the Secretary of State indicates that the issue had not been resolved as of July 21. The memorandum, which provides "talking points" for the Secretary, continues to reflect the U.S. position that taxation of Canal Commission employees by Panama would set an undesirable precedent and that the monetary gain to Panama

would be relatively small. In addition, the memorandum suggests that a U.S. concession on this point "would be the type of issue which treaty opponents could use to considerable advantage." Defendant's Brief at 95.

■ At this point, the contemporaneous record of negotiations abruptly ceases. It is important to note that the language that eventually became Article XV of the Implementation Agreement was not considered during any of the sessions for which we have a transcript or other contemporaneous documentation. Indeed, information provided by the U.S. Government does not disclose when this language was first considered, what if anything was said about it, or even who was in attendance. Curiously, the only evidence we have on the consideration of the Article XV language comes from *plaintiff* by means of the Affidavit of Dr. Carlos Alfredo Lopez Guevara, Panama's Ambassador Extraordinary and Plenipotentiary for Canal Treaty negotiations. Ambassador Guevara reports that the parties met a last time in Panama during August and that the language in question was presented by the United States during that session. According to Ambassador Guevara, "[the] text [of paragraph 2] was tabled without explanation and no objection was raised by the Panamanian Delegation. Therefore, it was agreed." Affidavit of Dr. Carlos Alfredo Lopez Guevara ¶ 5 (filed Mar. 8, 1984) [hereinafter cited as Guevara Affidavit].[16]

---

**15.** Certain materials pertaining to the negotiating history are still classified and were examined by the court ex parte. The portion of the opinion discussing classified information has been separately filed in camera and is subject to dissemination only pursuant to a separate order.

**16.** Ambassador Guevara goes on to state that the language of paragraph 2 was intended to preclude both the United States and Panama from taxing American employees of the Commission, that it was so read by Panama, and that a contrary interpretation by the United States would be viewed as a material breach of the treaty. Guevara Affidavit ¶¶ 6, 7.

Defendant has objected to this portion of the Guevara affidavit arguing that "it simply is an

opinion after the fact. It's not contemporaneous. It was prepared in preparation of this lawsuit." Official Transcript in the Matter of *Coplin v. United States,* Feb. 23, 1984, at 26 [hereinafter cited as Feb. 23 Transcript]. Defendant's position on the admissibility of this type of evidence has been less than consistent. Appended to defendant's brief is the Affidavit of Michael G. Kozak, Deputy Legal Advisor for the United States Department of State. Mr. Kozak states that between 1973 and 1977 he served as a member of the U.S. negotiating team for the Panama Canal Treaty and "participated directly in the negotiation of the Panama Canal Treaty and of the Agreements in Implementation thereof." Affidavit of Michael G. Kozak ¶ 3 (Dec. 8, 1982), *reprinted in* Defendant's Brief at 19. Mr. Kozak notes that he was "one of the principal

c. Defendant appears to overlook the fundamental issue in these negotiations when it argues that Article XV was not intended to shield Commission employees from U.S. taxation because that possibility was not expressly raised during the negotiating sessions for which we have a record. Equally naive is its assertion that Panama could have no interest in whether the U.S. taxes its citizens who live and work on Panamanian soil and operate the canal in which it has such a significant interest. Defendant's error lies in characterizing the negotiations as turning exclusively on fiscal issues, whereas the record indicates that the controversy was primarily a political one.[17]

drafters of the Treaty and of the Agreements in Implementation of Articles III and IV thereof." *Id.* ¶ 4. Mr. Kozak does not claim to have been present at the negotiating session where the language of Art. XV was considered nor do we have any other indication that he was there. *See* pp. 142–143 *infra.* Nevertheless, he opines as follows:

The purpose of the pertinent language of Article [ ] XV ... [is] to ensure that United States citizen employees of the Canal Commission ... would not be subject to host-country [i.e., Panamanian] taxation.

*Id.* ¶ 11. Defendant relied on the Kozak Affidavit to support its Requested Finding of Fact No. 6 pertaining to the purpose of Article XV. It is anomalous for defendant to object to the statement of Ambassador Guevara regarding the meaning of the language in question, but to tender the statement of Mr. Kozak on the very same point.

Defendant now concedes that the Kozak Affidavit may not be used to divine the purpose of Article XV. Feb. 23 Transcript at 30–32. Defendant has also suggested that reliance on the Kozak Affidavit to support its proposed finding as to intent was inadvertent. Reply Brief for the United States in Support of its Motion for Summary Judgment at 7 n. 4 (filed Jan. 23, 1984). Defendant has not, however, explained why paragraph 11 of the Kozak Affidavit was presented at all, given its position as to the admissibility of post-hoc statements by negotiators. Moreover, the Kozak Affidavit, in the very form presented to this court, has been presented to other courts that have considered this issue. *See* n. 9 *supra.* Some of those courts have expressly relied on it. *See, e.g., Stabler v. United States,* No. CA3–83–0166–R, slip op. at 3 (N.D. Tex. Nov. 30, 1983); *Pierpoint v. United States,* No. 83–0354–2, slip op. at 5–6 (D.S.C. Oct. 3, 1983). Other courts may have been swayed by the affidavit without specifically mentioning it.

Whether a court may consider non-contemporaneous statements of negotiators for purposes of divining the intention of the parties is, in fact, a difficult and unsettled question. At least one Supreme Court opinion seems to suggest that such evidence is not admissible. *Arizona v. California,* 292 U.S. 341, 359–60, 54 S.Ct. 735, 742–43, 78 L.Ed. 1298 (1934) (Brandeis, J.). It is unclear the extent to which the ruling in *Arizona* is bound up in the specific facts of that case and whether its rationale survives the adoption of the Federal Rules of Evidence. *See United States v. Jacobs,* 547 F.2d 772, 777 (2d Cir.1976), *cert. dismissed,* 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978) (purpose of Rule 402 "was to bar common law rules of evidence ... if inconsistent").

International courts and arbitrators have traditionally relied on non-contemporaneous statements of negotiators. For example, in a dispute concerning the Jay Treaty of Nov. 19, 1794, the depositions of John Adams and John Jay, surviving negotiators, were considered, as was a letter from Benjamin Franklin. 1 J. Moore, *International Adjudications* 63–67 (1929). One commentator has argued that where a jury is not involved, "[d]eclarations of [the] negotiators, in so far as they indicate the sense in which terms were employed, are valuable, not merely because they are enlightening, but also because they may be safely entrusted to the consideration of judges or arbitrators." 2 Hyde, *International Law* 1497; *cf. Sumitomo Shoji,* 457 U.S. at 187 n. 10, 102 S.Ct. at 2379 n. 10 (distinguishing government's official position from "evidence of the state of mind of the Treaty negotiators").

Because the issue is unsettled, and because the evidence in question is merely cumulative, the court decides this case *without* reliance on the statements of negotiators on either side as to the intent of the parties. The court notes, however, that insofar as reliance on such statements is deemed relevant and probative, Ambassador Guevara is the only one identified as having been present at the negotiating session where the language of Article XV was actually considered. He is therefore the only one competent to give an opinion as to the intent of the negotiators.

The court does rely on the Guevara Affidavit insofar as it describes the physical events at the August 1977 negotiating session. As an eyewitness participant, his competency to testify as to what he saw and heard is not subject to challenge. Indeed, defendant has largely adopted the Guevara version of what transpired. Official Transcript in the Matter of *Coplin v. United States,* Mar. 8, 1984, at 35–36 [hereinafter cited as Mar. 8 Transcript].

17. If the question had been one of revenues alone, it could have been resolved without reference to the tax issue. The parties were in the

To the United States, the question of revenues was of relatively little consequence; it felt, however, that allowing Panama to tax Commission employees would set a bad precedent worldwide. Panama, for its part, appears to have felt that operation of the canal was a joint commercial venture by the two governments, not a continued exercise of U.S. sovereign authority. Putting the matter in terms of other tax conventions to which the United States is a party, our negotiators wanted Commission employees to be treated for tax purposes as if they were performing purely U.S. governmental functions while the Panamanian negotiators wanted Commission employees treated as if they were providing commercial services. *See, e.g.,* Agreement for the Avoidance of Double Taxation and Prevention of Tax Evasion with Respect to Taxes on Income, Apr. 30, 1984, United States-China, art. 18, *reprinted in* 23 Tax Notes 695 (1984) (not yet ratified); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, June 17, 1980, United States-Denmark, art. 20, *reprinted in* Sen.Exec. Q, 96th Cong., 2d Sess. (1980) (not yet ratified) [hereinafter cited as Denmark Treaty]; Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, July 1, 1957, United States-Pakistan, art. IX, 10 U.S.T. 984, T.I.A.S. No. 4232 [hereinafter cited as Pakistan Treaty]; Convention for the Avoidance of Double Taxation and the Establishment of Rules of Reciprocal Administrative Assistance in the Case of Income and Other Taxes, Mar. 23, 1939, United States-Sweden, art. X, 54 Stat. 1759, T.S. No. 958 [hereinafter cited as Sweden Treaty].[18] So far as this record discloses, neither side gave any indication that it was prepared to yield to the other's position.

The language finally adopted reflected the position of neither party. Indeed, it neatly sidestepped the sensitive sovereignty issue altogether. Without a statement from Panama, it is of course difficult to be certain as to what its motivations might have been in accepting this language. However, several possibilities readily come to mind. First, and most obvious, a provision whereby the United States agreed not to tax Commission employees could have been construed by Panama as a recognition of the special status of the Panama Canal Commission. Moreover, an increase in the disposable income of Commission employees (by exempting their salary from U.S. taxation) would leave more for them to spend in Panama, thereby boosting the local economy. Finally, Panama could well

---

process of negotiating fees to be paid by the Commission for services provided by Panama. The package ultimately agreed upon called for an initial annuity to Panama of $50–60 million per year. S.Exec.Rep. No. 12, at 100. According to the U.S., Panama would derive no more than $2–3 million from taxing Commission employees. Defendant's Brief at 95. Because this amount was viewed as relatively trivial, it could have been factored into the negotiations for the annuity payment.

**18.** As these and other tax treaties demonstrate, the United States is committed to the principle that only those employees performing *governmental* functions will be exempt from host-country taxation. Article VI(2) of the treaty with Canada, for example, provides that the tax exemption "shall not apply to payments in respect of services rendered in connection with any trade or business carried on for purposes of profit by either of the contracting states or by any agency, instrumentality or political subdivision thereof." Convention and Protocol for the Avoidance of Double Taxation and Prevention of Fiscal Evasion in the Case of Income Taxes, Mar. 4, 1942, United States-Canada, art. VI(2), 56 Stat. 1399, T.S. No. 983 [hereinafter cited as Canada Treaty]. Whether operation of the Panama Canal is a profit-making enterprise or performance of a governmental function is a question as to which two states may differ. In that regard, it is worth noting that the technical explanation to a similar provision in a more recent treaty with Canada (not yet ratified) provides that the determination ought to be made "by a comparison with the concept of a governmental function in the State in which the income arises." Technical Explanation of the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital, signed at Washington, D.C., on Sept. 26, 1980, art. XIX, *reprinted in* Tax Treaties (CCH) ¶ 1317R. Application of a similar rule to the Implementation Agreement would suggest that the Panamanian conception of what is and what is not a governmental function ought to be given some weight.

have been concerned that Commission employees would be uncomfortable with their new status, suddenly finding themselves on foreign soil rather than on what had been essentially U.S. territory. Panama could have feared an exodus of skilled canal operators and might have been pleased to accept a compromise that made it more attractive for Americans to stay and work for the Commission. In short, the record does not support defendant's assertion that Panama could have had no conceivable interest in whether the United States taxes Commission employees.

From the perspective of the United States, the language of Article XV could also have been viewed as advantageous. By providing that neither country could tax the salary of Commission employees, the United States avoided the possibility of Panamanian taxation and the undesirable precedent it would have set. Moreover, compromise language avoided the danger (noted by Ambassadors Bunker and Linowitz) that the issue might be used by treaty opponents as an argument against ratification. Because the loss of tax revenue was not considered significant, side-stepping the sensitive issue of sovereignty that divided the parties could well have been welcomed by the United States.

To be sure, the language of Article XV did not satisfy all of the concerns of the parties; it was certainly an uneasy compromise. Yet, the time for concluding negotiations was drawing near and there was growing pressure to bring the process to a successful conclusion. *See, e.g.,* N.Y. Times, Aug. 2, 1977, at A1, col. 5; Wash. Post, July 30, 1977, at A2, col. 3; N.Y. Times, July 30, 1977, at A1, col. 3. A compromise that left the sovereignty issue unresolved and allowed each side to claim victory as to its essential concerns seems entirely plausible.

It is conceivable, of course, that in August 1977 the Panamanian delegation decided to abandon its position entirely and embrace the view advanced by the United States. However, there is simply no evidence on this record that this occurred.

Certainly, the fact that the Panamanians accepted language that on its face is a *compromise* provides no support at all for the proposition that they capitulated entirely and accepted the U.S. view that they had so forcefully resisted. A fair review of the negotiating history of Article XV leads to the conclusion that in all likelihood the language adopted accurately reflects the agreement reached by the parties.

**d.** Defendant also suggests that the United States would not have entered into an agreement with Panama as to how it would tax its own citizens, that being an internal matter not the proper subject of negotiation with foreign governments. Despite its common sense appeal, defendant's argument fails because it is based on a false premise.

The fact is that our government regularly enters into treaties and conventions limiting the amount of tax that the United States may collect from its own citizens. The most common type of provision fits under the heading of "relief from double taxation" and precludes the United States from taxing its citizens or residents to the extent that income taxes have been paid to the other signatory to the convention. *See, e.g.,* Pakistan Treaty art. XV; Canada Treaty art. XV; Sweden Treaty art. XIV; U.S. Draft Model Income Tax Convention of June 16, 1981, art. 23, *reprinted in* Tax Treaties (P–H) ¶ 1022. Another situation where the United States has agreed to limit the tax it will impose upon its citizens is in the area of shipping and air transportation. In some treaties, the United States appears to have bound itself not to tax U.S. citizens who operate such businesses in other signatory states. *See* Convention for the Avoidance of Double Taxation with Respect to Taxes on Income, July 22, 1954, United States-Germany, art. V, 5 U.S.T. 2768, T.I.A.S. No. 3133; Sweden Treaty art. IV.

Occasionally, the United States negotiates treaties that exempt certain types of income from taxation by both states. For example, the 1957 treaty with Pakistan contained a "tax sparing" provision. Pakistan

Treaty Art. XV(1). Under that provision, American investors in Pakistan would have been allowed a credit consisting not only of taxes paid to Pakistan, but also of taxes waived by virtue of Pakistan's investment incentive program. Under the terms of this provision, certain Americans doing business in Pakistan would have been exempt from taxation by both countries. The Senate adopted a reservation preventing this provision from going into effect because of a change in Pakistani law. It did, however, express its continued interest in this type of arrangement. S.Exec.Rep. No. 1, 85th Cong., 2d Sess. 3 (1958).[19] A more recent treaty signed with Italy (but not yet ratified) exempts certain types of alimony and child support payments from taxation in both jurisdictions. Convention for the Avoidance of Double Taxation with Respect to Taxes on Income and the Prevention of Fraud or Fiscal Evasion, Apr. 17, 1984, United States-Italy, art. 18(3); *see also* Convention with Respect to Taxes on Income and Capital, Sept. 26, 1980, United States-Canada, art. XVIII(6)(b), *reprinted in* S.Exec. T, 96th Cong., 2d Sess. (1980) (alimony and child support payments exempted from U.S. tax if Canada would exclude such payments from the recipient's taxable income). These agreements demonstrate that it is not unprecedented for the United States and another government to agree that certain parties will be exempted from taxation in both jurisdictions.

▬ Contrary to defendant's assertion, therefore, no principle of law, policy or tradition precludes the United States from negotiating with another government as to U.S. taxation of American citizens. When Americans live, work or invest abroad (or when citizens of other countries live, work or invest in the United States) taxation of their income becomes the concern of both states. Under those circumstances, it is not at all unusual for the two governments to apportion the amount of tax collected by each so as to assure fairness or serve some other policy. Such agreements generally contain provisions that limit how much tax the United States may collect from its own citizens and residents, in exchange for reciprocal promises from the other signatory.

The negotiating record indicates that the negotiators considered more traditional approaches such as tax sharing and tax rebating but rejected them because of objections from the United States. That the provision actually adopted is somewhat unorthodox may simply reflect the unusual circumstances surrounding the treaty negotiations and the history of the canal. However, the language adopted is not such a drastic departure from past practice as to render unthinkable the notion that it could have been the product of a deliberate compromise.

## 2. Deference to the Position of the United States

▬ As the Supreme Court has often noted, the interpretation given a treaty by the Executive Branch of our government is entitled to significant deference. *E.g.*, *Sumitomo Shoji*, 457 U.S. at 184–85, 102 S.Ct. at 2379–80; *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961); *Factor v. Laubenheimer*, 290 U.S. 276, 295, 54 S.Ct. 191, 196, 78 L.Ed. 315 (1933). This deference is based on a number of related considerations. Because the Executive Branch is involved directly in negotiating treaties, it is well situated to assist the court in determining what the parties intended when they agreed on a particular provision. Moreover, treaties normally carry significant foreign policy implications, matters peculiarly within the purview of the political branches of our government. A court

---

**19.** The issue has arisen again from time to time. Exchange of Notes Regarding the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Aug. 1, 1977, United States-Morocco, T.I.A.S. No. 10194. Most recently it was considered during the negotiations of the tax treaty between the United States and China signed on April 30, 1984. Exchange of Notes Regarding the Agreement for the Avoidance of Double Taxation and Prevention of Tax Evasion with Respect to Taxes on Income, Apr. 30, 1984, United States-China, *reprinted in* 23 Tax Notes 701 (1984).

should minimize intrusion in the conduct of foreign affairs by adopting the interpretation suggested by the Executive Branch whenever it can fairly do so. Finally, the Executive Branch generally has administrative authority over the implementation of international agreements. As in the case of domestic legislation, a court should generally give great weight to the interpretations of agencies charged with implementation of treaties because such agencies may possess significant expertise in the relevant subject matter.

■ Deference, however, is not the same as blind acceptance. There is no authority for the proposition that a court construing a treaty must follow the interpretation suggested by our government where that interpretation is unreasonable or runs contrary to what the court determines was the intent of the high contracting parties.[20] Indeed, the Supreme Court has noted that "courts interpret treaties for themselves," *Kolovrat,* 366 U.S. at 194, 81 S.Ct. at 926, and that the construction given by government agencies is "not conclusive," *Sumitomo Shoji,* 457 U.S. at 184, 102 S.Ct. at 2379.[21] *Accord Factor v. Laubenheimer,* 290 U.S. at 295, 54 S.Ct. at 196; Restatement (Second) of the Foreign Relations Law of the United States § 150 (1965) [hereinafter cited as Restatement]. The deference afforded depends upon the degree to which the interpretation proffered by our government is reasonable, unbiased and consistent with what appear to be the circumstances surrounding the treaty. As discussed below, there is much on this record that undermines the plausibility of the position taken by the United States, and hence the deference that the court is able to afford to the interpretation it advances in this litigation.

**a. The Implausibility of a Drafting Error.** In attempting to explain why the language of Article XV does not reflect what it claims was the intention of the parties, defendant has suggested that there has been a drafting error or at least inartful draftmanship. This explanation does not ring true. In the first place, the error the United States now argues it made is so obvious that it fairly leaps from the page even upon a cursory reading of Article XV. This is not a situation where the language used was ambiguous or imprecise; rather, language was used which, in its plain and ordinary meaning, achieves an end that the United States now repudiates.

The Supreme Court has noted that "treaties are the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning and to choose apt words in which to embody the purposes of the high contracting parties." *Rocca v. Thompson,* 223 U.S. 317, 332, 32 S.Ct. 207, 210, 56 L.Ed. 453 (1912). This observation is certainly germane here. The record discloses that (aside from our two ambassadors and miscellaneous other negotiators) at least three

---

**20.** Our State Department has, in fact, advised other states that "[u]nder the system of government of the United States, a final decision of questions involving the interpretation of laws and treaties, from the standpoint of municipal law, rests with the courts." *Aide memoire* handed the German Ambassador by the Under Secretary of State (Phillips) (May 3, 1933), MS. Department of State, file 611.623 Coal/46, *quoted in* 5 G. Hackworth, *Digest of International Law* 267 (1943).

**21.** The principle that courts are not bound by the unilateral interpretations of only one of the signatories is shared by other nations. For example, the French courts have held as follows: [B]oth in theory and in present day judicial practice, when a governmental interpretation is unilateral—that is, when it expresses the opinion of one only of the contracting parties—it has a merely advisory effect. But, on the other hand, if the interpretation is agreed upon by both governments, there is, so to speak, a clause added to the treaty which is embodied therein, has the same authority, and, like it, has the binding force of a law. *Societe Ruegger & Boutet c. Societe Weber & Howard,* 32 Revue Critique de Droit International 86, 87 (Le Tribunal Civ. de la Seine (3e Ch.)) (1934), *English synopsis in* Annual Digest and Reports of Public International Law Cases 404, 405 (H. Lauterpacht ed. 1940). The effect of a *bilateral* interpretation of the treaty, and the failure of the United States to provide such an interpretation, is discussed at greater length below. *See* pp. 146–148 *infra.*

State Department attorneys were directly involved in the negotiation and drafting process, including the Legal Adviser himself, the highest ranking attorney in the State Department. In addition, this provision was of significance to other agencies of the United States government; the negotiating transcripts specifically mention that the Department of the Treasury was consulted on the issue. It is simply incredible that in negotiating a sensitive and important provision with a foreign government, with the advice and assistance of so many experienced attorneys and negotiators, the representatives of the United States of America were unable to come up with language that more accurately reflected their intentions.

Nor was this a case where the language was thrown together at the last minute so that our negotiators could not take advantage of the resources at their disposal. The language of Article XV underwent significant revision in the drafting process. According to defendant, the language of Article XV was adapted from a similar provision in the Implementation Agreement pertaining to Article IV of the treaty, the so-called Status of Forces Agreement (SOFA). Agreement in Implementation of Article IV of the Panama Canal Treaty, Sept. 7, 1977, United States-Panama, art. XVI, T.I.A.S. No. 10032. A comparison between Article XV of the Implementation Agreement and the relevant Article of SOFA reveals a significant number of wording changes.[22] In addition, defendant

has produced no fewer than four intermediate drafts, prepared over the course of several weeks. *See* Defendant's Response to Plaintiffs' Interrogatories at 2 (no. 2) (filed June 11, 1984). The language of Article XV quite clearly was subject to careful scrutiny and manipulation before the drafters were satisfied that it accurately expressed their intentions.

It is of particular significance that during the drafting process the phrase "as provided by Panamanian law" was deleted from the second sentence of paragraph (2) of the SOFA. *See* n. 22 *supra*. This language in the SOFA firmly anchors the subject matter of its paragraph (2) to Panamanian law. Experienced attorneys would surely have appreciated the negative inference raised by deleting such language from the equivalent paragraph of the Implementation Agreement. Moreover, the deletion suggests that the drafters were aware that Panamanian law would not otherwise exempt Commission employees from taxation; this was an issue raised by Panama during the negotiations.[23] This careful tailoring of the language of Article XV and particularly the very paragraph here in issue, does not square with defendant's theory of error through unthinking adoption of boilerplate language.

Finally, Status of Forces Agreements with other countries contain provisions that are similar to Article XV of the Implementation Agreement, except for the fact that

**22.** The following is the full text of SOFA Article XVI, with all words changed or deleted in drafting the Implementation Agreement emphasized:

(1) By virtue of this Agreement, *the United States Forces* are exempt from payment in the Republic of Panama of all taxes, fees or other charges on their activities or property, *including those imposed through contractors or subcontractors.*

(2) *Members of the Forces or the civilian component,* and dependents, shall be exempt from any taxes, fees, or other charges on income received as a result of their work for the *United States Forces or for any of the service facilities referred to in Articles XI or XVIII of this Agreement.* Similarly, *as is provided by Panamanian law,* they shall be exempt from payment of taxes, fees or other

charges on income derived from sources outside the Republic of Panama.

(3) *Members of the Forces or the civilian component,* and dependents, shall be exempt from taxes, fees or other charges on gifts or inheritance or on personal property, the presence of which within the territory of the Republic of Panama is due solely to the stay therein of such persons on account of their or their sponsor's work with the *United States Forces.*

(4) *The Joint Committee* may establish such regulations as may be appropriate for the implementation of this Article.

**23.** Defendant's Brief at 79 (Statement of Mr. Rodrigo Gonzalez during the July 14, 1977, negotiating session).

they are very specific about which country is providing the tax exemptions. For example, the NATO SOFA provides that "[m]embers of a force or civilian component shall be exempt from taxation *in the receiving State."* North Atlantic Treaty, June 19, 1951, art. X(1), 4 U.S.T. 1792, T.I.A.S. No. 2846 (emphasis added); *see also* Agreement Under Article IV of the Mutual Defense Treaty Regarding Facilities and Areas and the Status of United States Armed Forces in the Republic of Korea, July 9, 1966, United States-Korea, art. XIV(2), 17 U.S.T. 1677, T.I.A.S. No. 6127 (exemption from payment of "any Korean taxes to the Government of the Republic of Korea"); Agreement Regarding Status of United States Forces in Australia, May 9, 1963, United States-Australia, art. 6(1), (2), 14 U.S.T. 506, T.I.A.S. No. 5349 (exemption from "Australian tax" and "taxation under the laws of the Commonwealth of Australia"); Agreement Under Article VI of the Treaty of Mutual Cooperation and Security: Facilities and Areas and the Status of United States Armed Forces in Japan, Jan. 19, 1960, United States-Japan, art. XIII(2), 11 U.S.T. 1652, T.I.A.S. No. 4510 (exemption from payment of "any Japanese taxes to the government of Japan"); Agreement Regarding Status of United States Forces in Lebanon, July 31-Aug. 6, 1958, United States-Lebanon, 10 U.S.T. 2166, T.I.A.S. No. 4387 (exemption from "any form of taxation in Lebanon"). In the words of Mr. Chief Justice Hughes, "[w]e must assume that the representatives of the United States had these clauses before them when they negotiated [the Implementation Agreement] and that the omission was deliberate." *Valentine v. United States ex rel. Neidecker,* 299 U.S. at 13, 57 S.Ct. at 104.

**b. The Failure of the United States to Clarify the Language of Article XV Before the Treaty Went Into Effect.** It is not entirely clear when the United States first became aware of the error it now claims is part of Article XV of the Implementation Agreement. The record does reveal that two weeks after the treaty documents were first signed, there were written communications within the government noting the need to clarify the issue. Memorandum from Marcia Field to Richard Goodman (Sept. 21, 1977), *reprinted in* Submission Pursuant to the Judge's Order Filed June 6, 1984, at Exhibit E (filed June 11, 1984). Despite this very early notice, the record discloses a remarkable degree of reluctance on the part of the United States to seek a clarification of the Article XV language from Panama. That reluctance casts doubt upon defendant's assertion that the Article XV language was an error rather than a compromise. The court notes at least three opportunities for clarifying the language of Article XV even after it was initially accepted by Panama but long before the treaty documents went into force.

*First.* Immediately following the Implementation Agreement there is an Agreed Minute consisting of 21 numbered paragraphs (many having several sub-paragraphs) each of which specifically refers to a portion of the Implementation Agreement. Each paragraph and sub-paragraph provides explanatory and clarifying information as to the understanding of the negotiators pertaining to various portions of the Implementation Agreement. *See* S.Exec.Rep. No. 12, at 35. The Minute thus serves as an official negotiating history to clarify or round out terms of the agreement that were thought to be unclear or ambiguous. No paragraph of the Minute refers to Article XV of the Implementation Agreement.

*Second.* There was an exchange of notes between the representatives of the United States and Panama on September 7, 1977, the date the treaties were signed. This was approximately a month after agreement had been reached on the language of Article XV. The notes dealt with a number of matters not covered by the treaty documents and also supplied clarifications and assurances as to the effect of the various provisions. *See, e.g.,* Exchange of Notes Relating to Postal Services, Sept. 7, 1977, United States-Panama, *reprinted in* S.Exec.Rep. No. 12, at 276 (exchange of notes clarifying operation of Article X of

Agreement in Implementation of Article IV.[24] There was no note exchanged pertaining to Article XV of the Implementation Agreement, at that time or since.

*Third.* During testimony by Herbert J. Hansell, the Department of State's Legal Advisor, before the Foreign Relations Committee, Senator Richard Stone raised a serious question about the meaning of Article XV. Senator Stone cited newspaper reports that Zone residents were interpreting Article XV as exempting them from U.S. income taxes, much as plaintiff now claims. The Senator expressed concern that the matter would spawn litigation and suggested that the language be clarified by means of a formal understanding attached to the ratification documents. *Treaty Hearings* Part 1, at 268. Mr. Hansell strongly resisted the suggestion but promised that "we will find a way to avoid this" and Senator Stone dropped the subject. *Id.* at 269.

Senator Stone's suggestion that the meaning of Article XV be clarified by means of an understanding was sensible and consistent with established practice. It is not at all unusual for the Senate to approve a treaty subject to a formal declaration modifying or clarifying its terms. Where the declaration exempts the United States from a portion of the treaty, or changes one of its terms, it is called a reservation. Restatement § 124; Vienna Convention art. 2(1)(d), 63 Am.J.Int'l L. 876. Where the declaration merely sets forth the Senate's interpretation of a basic term of the agreement, without purporting to change it, it is called an understanding. Restatement § 124 comment c; 14 M. Whiteman, *Digest of International Law* 137–38 (1970) [hereinafter cited as Whiteman, *Digest*].

Reservations and understandings are communicated to the other signatory before the formal exchange of ratification documents. If the terms of the reservation or understanding are acceptable, the other party will affirmatively communicate its acceptance or at least will fail to object. The party will then be bound by the treaty as so modified or clarified. Restatement § 124; D.H. Miller, *Reservations to Treaties* 76–80 (1919) [hereinafter cited as Miller, *Reservations*]; 14 Whiteman, *Digest* 138–39. *See generally* Bishop, 103 Receuil de Cours 266–302. This principle was recognized by the Supreme Court as established over a century and a quarter ago:

> [I]t is too plain for argument that where one of the parties to a treaty, at the time of its ratification annexes a written declaration explaining ambiguous language in the instrument or adding a new and distinct stipulation, and the treaty is afterwards ratified by the other party with the declaration attached to it, and the ratifications duly exchanged—the declaration thus annexed is a part of the treaty and as binding and obligatory as if it were inserted in the body of the instrument.

*Doe v. Braden,* 57 U.S. (16 How.) 635, 656, 14 L.Ed. 1090 (1853).[25] Only if the other signatory objects to the proposed reservation or understanding will the parties have to resolve their differences by further negotiation. However, to be effective,

> [t]he declaration must be *communicated* to the other Party ... to the treaty. This is obviously necessary, for a treaty is an agreement, and failure to communicate such a declaration would deprive it of any international effect.

**24.** An exchange of notes to correct errors or omissions in an executive agreement is entirely consistent with past practice of the United States. *See* 14 M. Whiteman, *Digest of International Law* 134–36 (1970).

**25.** The practice of attaching reservations to treaties dates back at least to 1795 when the Senate gave its advice and consent to ratification of the Treaty of Amity, Commerce and Navigation between the United States and Great Britain (commonly known as the Jay Treaty), subject to certain conditions. 8 Stat. 116, T.S. No. 105. One commentator estimated that between 1800 and 1929 the Senate had introduced reservations into at least 66 bilateral treaties. Owen, *Reservations to Multilateral Treaties,* 38 Yale L.J. 1086, 1091 (1929).

Miller, *Reservations* 77 (emphasis original).[26]

If both sides intended that Article XV exempt employees of the Commission only from Panamanian taxes, following Senator Stone's suggestion would have clarified the issue once and for all. The Senate in fact considered a number of reservations and understandings to the treaty package and passed no fewer than 21 of them. *Senate Debate on the Panama Canal Treaties* 411–13, 493–96. Each of these was accepted by Panama and became part of the treaty package without the need for reopening negotiations. *Id.* at 549–52, 557–59. Prudence, candor to our negotiating partner and fairness to the American public, which would have to bear the cost of clarifying the issue through litigation,[27] all strongly supported Senator Stone's suggestion that the language of Article XV be clarified through a formal understanding.

The United States argues that such an understanding would have been superfluous because the language of Article XV is clear, because taxation of U.S. citizens is purely an internal matter and because Panama could have no legitimate interest in how the United States construes this language. As discussed above, these assertions are subject to significant doubt. Nevertheless, even if one were to assume that the United States was fully justified in its views, the refusal to confront Panama and seek its concurrence is so striking a departure from the practice of the United States in the field of public international law as to give one serious pause.

Even the most cursory review of how the United States has conducted itself in this delicate area reveals unflagging adherence to the principle that potential disagreements, even of the most remote kind, are resolved through concurrence of the signatory parties, preferably before the treaty

goes into force. *Doe v. Braden,* 57 U.S. (16 How.) 635, 14 L.Ed. 1090 illustrates this point. The case involved a treaty whereby Spain ceded certain territories to the United States. The treaty was signed by the President and approved by the Senate. However, before ratification instruments could be exchanged, our government learned of a claim to the territory by a third party. *Id.* at 655. Although the Secretary of State was satisfied that this claim was entirely without merit, he "deemed it his duty to place the matter beyond all controversy before the ratifications were exchanged." *Id.* The United States therefore insisted on the inclusion in the treaty documents of a written declaration expressing "the positive understanding of the negotiators on both sides" that the claim in question had been annulled. *Id.* The treaty then had to be resubmitted to the Senate and only then were ratification instruments exchanged, bringing the treaty into force.

Our Department of State has, moreover, consistently taken the position that one signatory to an international agreement cannot unilaterally determine what is and what is not of significance to the other signatory. Even matters that are merely of a clarifying nature, or which purport to confirm the view of the negotiators, must be formally presented if they are to become part of the treaty. This position is perhaps best expressed in advice given to Congress by a representative of the Department of State:

He [Mr. Beverage] asked what kind of reservation would not require renegotiation of a treaty. I emphasized that it was impossible to define such a reservation because each other country concerned has the right to decide whether or not a particular reservation modifies the text or would affect its interests in the

---

**26.** In *Sullivan v. Kidd,* 254 U.S. 433, 442, 41 S.Ct. 158, 161, 65 L.Ed. 344 (1921), the Court rejected the argument that a treaty with Britain ought to be interpreted in accordance with the intention of the British negotiators because it found no evidence that their position had been made known to the United States.

**27.** At least 42 lawsuits, involving perhaps hundreds of plaintiffs, have presented the issue to this and other courts. *See* n. 9 *supra.* The cost borne by the plaintiffs, the defendant and the judicial system in resolving this issue through piecemeal litigation has been, and will continue to be, substantial.

application of the treaty. In reply to his statement that he had in mind a reservation which merely clarified the intention of the negotiators, I said that, nevertheless, the other countries concerned would still be entitled to their views with respect to the effect of the reservation.

Office of the Legal Adviser, Treaty Branch (Bevans), "Reservations to treaties," memorandum of conversation with Mr. Beverage of Senator Langer's office, July 20, 1949, MS. Department of State, file 711.00/7–2049, *quoted in* 14 Whiteman, *Digest* 140.

█ Much thought has also been given to whether matters that are of purely domestic concern to one of the negotiating parties must be presented for the approval of the other party. The advice given by the State Department again clarifies the position of the United States:

He also inquired as to whether a simple reservation relating to "a purely domestic matter", such as "one requiring approval by two-thirds of the Senators of any arms assistance", would have to be approved by other countries. I explained that while the reservation may be considered by the United States as relating to a purely domestic matter, the fact that our ratification is given subject to a reservation would give the other countries concerned the right to consider whether or not the reservation affected our international obligations under that treaty or would affect the application of the treaty in our relations with other countries.

*Id.*

The position traditionally taken by the United States is so intuitively correct that it requires little elucidation. The fact is that even exercising the utmost good faith, one country simply cannot take into account all of the interests, points of view, political and social factors, perceived advantages and disadvantages, realities and appearances, and other considerations that define another country's self-interest. As an equal sovereign, each country is entitled to make up its mind as to whether a particular provision of a treaty, or a reservation or understanding attached thereto, does or does not affect its interests. It has been traditional, therefore, for our government to inform its negotiating partners of even those matters that it believes are of no consequence to them, and to allow them an opportunity to assent or object. *See, e.g., Power Authority of New York v. Federal Power Commission,* 247 F.2d 538 (D.C. Cir.), *vacated as moot sub nom., American Public Power Association v. Power Authority of New York,* 355 U.S. 64, 78 S.Ct. 141, 2 L.Ed.2d 107 (1957).

The *Power Authority of New York* case involved a treaty with Canada concerning use of the water of the Niagara River. In ratifying the treaty, the Senate attached a stipulation that reserved to the United States the right "to provide by Act of Congress for redevelopment, for the public use and benefit, of the United States share of the waters" made available through the treaty. *Id.* at 539. Our Department of State advised the Canadian Government of this "reservation" but took the position that this was a purely internal matter, of no interest to Canada. Canada responded by diplomatic note, accepting the position of the United States that this was a matter relating "only to the internal application of the Treaty within the United States [that did] not affect Canada's rights or obligations under the Treaty." *Id.* at 541. The court relied upon this disclaimer in determining that the reservation was not a matter of interest to Canada, and therefore effectively not a part of the treaty. *Id.*[28]

---

**28.** Additional examples of this practice are abundant. For example, in giving its advice and consent to the treaty establishing friendly relations with Austria signed on August 24, 1921, the Senate included a series of understandings dealing with matters of U.S. domestic law. Prior to the exchange of ratification instruments, Secretary of State Hughes wrote to Austria and advised that these understandings "of course relate merely to matters of domestic policy and procedure, which are of no concern to the Austrian Government." Letter from Secretary of State Hughes to Commissioner Frazier of Austria (Oct. 24, 1921), MS. Department of State file 711.63119/22b, *quoted in* 5 G. Hackworth, *Digest of International Law* 120–21

These principles have been applied so uniformly by our State Department in dealings with other governments, and by other governments in their dealings with us, that they can fairly be characterized as reflecting the universally accepted practice in the area of international law. *See generally* 14 Whiteman, *Digest* 137–93; 5 G. Hackworth, *Digest of International Law* 93–153 (1943) [hereinafter cited as Hackworth, *Digest*]. Indeed, a memorandum prepared by the State Department and transmitted to the United Nations stated the proposition as follows:

> Even in the case of an "understanding" ... it is the *invariable rule* in regard to bilateral treaties to obtain the consent of the other country before ratifying the treaty.

U.S. Department of State, *The Law of Treaties as Applied by The Government of the United States of America* 102 (Mar. 31, 1950), *quoted in* Bishop, 103 Receuil des Cours 304 (emphasis added).[29] The failure of our government to comply with this established practice throughout the treaty ratification process, despite serious questions on the proper construction of Article XV raised by Congress, the press and within the Executive Branch itself, diminishes further the deference that the court can accord defendant's interpretation of the language in question.

Over half a century ago Charles Evans Hughes wrote the following in response to a Senate inquiry as to the types of reservations or understandings that might proper-

ly be attached to the ratification of the Treaty of Versailles:

> Statements to safeguard our interest which clarify ambiguous clauses in the covenant by setting forth our interpretation of them, and especially when the interpretation is one which is urged by the advocates of the covenant to induce support, can meet with no reasonable objection. It is not to be supposed that such interpretations will be opposed by other parties to the treaty, and they will tend to avoid disputes in the future.

58 Cong.Rec. 3302 (1919). The interpretation of Article XV offered by our Department of State to the Senate can fairly be characterized as "urged by the advocates of the covenant to induce support." If the defendant is correct that it concerns a purely internal matter of no consequence to Panama, then "it is not to be supposed that such interpretation[ ] [would have been] opposed by [the] other part[y] to the treaty." Under such circumstances, the clarification of the meaning of Article XV by means of an understanding, as suggested by Senator Stone, a diplomatic note, or some other means that secured concurrence from Panama on this simple point "[could] meet with no reasonable objection ... [and would have tended] to avoid disputes in the future." Since defendant has offered no satisfactory explanation for its failure to follow established practice in this sensitive area, the court must infer that officials of the Department of State who were familiar with the treaty negotiations (and had access to the then classified negotiating tran-

---

(1943). The Austrians were satisfied with this explanation and approved the exchange of ratification documents. Letter from Commissioner Frazier to Secretary of State Hughes (Nov. 8, 1921), MS. Department of State file 711.63119/26 *cited in* 5 Hackworth, *Digest* at 121.

**29.** Marjorie Whiteman, Assistant Legal Adviser to the United States Department of State, expressed the same view in almost identical terms:

> A statement designated as a "reservation" or "reservation and understanding" contained in an instrument of ratification of a treaty may be regarded as nothing more than a clarifying statement or declaration short of a reservation if it does not, in fact, constitute a qualifi-

cation or modification of the substantive terms of the treaty. Nevertheless, in the case of a bilateral treaty *it is the invariable practice,* prior to the making of arrangements for the exchange of ratifications and sometimes even prior to ratification of the treaty, *for the government making the statement or declaration to notify the other government thereof in order that the latter may have an opportunity to accept, reject, or otherwise express its views with respect thereto.*

14 Whiteman, *Digest* 188–89 (emphasis added). The *Digest* catalogues and generally reflects the official position of the United States on questions of international law.

scripts) feared that Panama would refuse to concur in their interpretation of Article XV and for that reason refused to seek its consent.

■ **c. Additional Considerations.** A number of other factors, each of them perhaps less weighty than the foregoing, conspire to further undermine the deference the court is able to afford the interpretation offered by the United States. It is worth mention, for example, that in this case the United States is a litigant—a party with a financial interest in the outcome of the proceedings. In such circumstances it is appropriate to scrutinize its position more closely than where it is participating as amicus curiae, its only interest being the proper conduct of our foreign relations and the correct interpretation of our laws. *See, e.g., Sumitomo Shoji,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765; *Kolovrat,* 366 U.S. 187, 81 S.Ct. 922, 6 L.Ed.2d 218.

Moreover, this case is not like *Factor v. Laubenheimer,* 290 U.S. at 295, 54 S.Ct. at 196, or *Great-West Life Assurance Co.,* 678 F.2d 180, 230 Ct.Cl. at 491, where the construction offered by the United States had remained unchallenged for decades and therefore was entitled to deference by virtue of its longevity and consistency. *Cf. Consumer Products Safety Commission v. GTE Sylvania,* 447 U.S. 102, 120, 100 S.Ct. 2051, 2062, 64 L.Ed.2d 766 (1980) (lack of longstanding contemporaneous administrative construction of statute undermines degree of deference to be afforded agency's interpretation). Here, the controversy over what this language means arose within days of its initial adoption, in ample time for the United States to obtain a correction or clarification before the ratification process was completed. Nor is the language of Article XV so complex, or its subject matter so specialized, that deference to administrative expertise is of particular relevance. *Cf. Great-West Life Assurance Co.,* 678 F.2d 180, 230 Ct.Cl. at 481.

■ Finally, defendant has offered no factual basis supporting a significant degree of administrative deference. Indeed, it appears that the interpretation of Article XV proffered by the United States consists of little more than the best hopes of State Department officials, many of whom had no direct involvement in the negotiation of this provision. The letter transmitting the section-by-section analyses to the Senate states that they were prepared "by members of the treaty negotiating team and have been approved by the offices of the State and Defense Departments directly involved in the negotiations." S.Exec.Rep. No. 12, at 127. It is interesting to note, however, that there is no evidence that anyone involved with the actual negotiation of Article XV of the Implementation Agreement drafted or reviewed these analyses. In response to a discovery request, defendant admitted that the analyses were prepared after the negotiations had been completed and after the treaty documents had been signed. Defendant's Response to Plaintiff's Second Request for Admissions at 2 (Nos. 21 and 22) (filed June 11, 1984). Moreover, defendant disclosed that the analyses were drafted by two individuals, Michael Kozak and Geraldine Chester, who were not present at any of the negotiating sessions during which we know that the substance of Article XV was discussed. *Id.* (No. 22b(A)) (Mr. Kozak and Ms. Chester were present at the July 18, 1977, negotiating session where there appears to have been some general discussion of the Implementation Agreement but not of Article XV or the subject of taxation.) Defendant admits that it does not know who was present when the Article XV language was proposed or discussed. Defendant's Response to Plaintiffs' Interrogatories at 3 (No. 10) (filed June 11, 1984). There is no evidence, therefore, that the supposedly authoritative interpretations of the language proffered by the United States were ever reviewed or approved by those who were involved in face-to-face negotiations with Panama on the subject.

### 3. The Legislative History

Defendant suggests that the Senate consented to the ratification of the Panama Canal Treaty with the understanding that

Article XV of the Implementation Agreement exempted Commission employees only from Panamanian taxation and not from United States taxation. Defendant cites in support of its proposition the colloquy between Senator Stone and the State Department's Legal Adviser, Mr. Hansell, *see* p. 138 *supra,* and the Report of the Senate Foreign Relations Committee, which incorporated the State Department's section-by-section analysis.

Even in the case of purely domestic legislation, "[r]eliance on legislative history in divining the intent of Congress is ... a step to be taken cautiously." *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977); *see Hart v. United States,* 585 F.2d 1025, 218 Ct.Cl. 212, 221–31 (1978). That caution must be even greater where the document in question grows out of sensitive negotiations with a foreign government whose intentions and views can only be expressed through treaty language and other documents attached to the ratification process.

It should first be noted that the legislative history cited by defendant is not as compelling as it would have the court believe. The most one can say about the conversation between Senator Stone and Mr. Hansell is that one member of the Senate Foreign Relations Committee may have been persuaded by the position taken by the Executive Branch; there is no indication that any other members of the Committee shared those views. "[O]rdinarily even the contemporaneous remarks of a single legislator ... are not controlling in analyzing legislative history." *Consumer Products Safety Commission,* 447 U.S. at 118, 100 S.Ct. at 2061. The Committee Report merely recites the interpretation offered by the State Department without elaboration or discussion. Of course, there was no reason the Committee should have questioned the interpretation offered by the Executive Branch. The issue, on its face, appeared to be merely one of domestic tax law; the negotiating transcripts, which place the matter in a wholly different light, were still classified and there is

no indication that they were presented to or examined by the Committee.

In any case, all three branches of our government have taken the position that even the clearest expression of legislative intent cannot change the legal effect of an international agreement to which the Senate has given its approval. In *Fourteen Diamond Rings v. United States,* 183 U.S. 176, 179–80, 22 S.Ct. 59, 60–61, 46 L.Ed. 138 (1901), the Court held that a Senate Resolution that had not been brought to the attention of Spain, the other signatory to the treaty, was "absolutely without legal significance." Charles Evans Hughes, in his letter to the Senate in 1919, considered this proposition as black letter law: "The adoption of resolutions by the Senate setting forth its views will not affect the obligations of the covenant if it is in fact ratified without reservations which constitute part of the instrument of ratification." 58 Cong.Rec. 3302 (1919).

The Senate thoroughly considered the same issue during the deliberations over the Kellogg-Briand Peace Treaty of August 27, 1928. *See* 70 Cong.Rec. 1655 *et seq.* (1929). After considerable debate, the Senate concluded that a legislative report not mentioned or included in the resolution of ratification could not modify or amend the treaty in any way. *See id.* at 1730. This view was accepted by the Department of State and related to other signatories of the treaty. Telegram from Secretary of State Kellogg to Ambassador to Great Britain (Jan. 17, 1929) & Telegram from Secretary Kellogg to Ambassador to France (Jan. 18, 1929), *cited in* 5 Hackworth, *Digest* 153.

The State Department has consistently taken this view. For example, on May 24, 1907, Secretary of State Root wrote Dominican Republic Minister Joubert concerning the effect of a resolution adopted by the Dominican Congress in approving a convention with the United States. Secretary Root requested that the resolution—which explained the Dominican Congress' interpretation of the convention—not be included in the instrument of ratification because

to do so might change the legal effect of the treaty, making it impossible for our President to accept the ratification. On the other hand, Secretary Root took the position that if the legislative report was not attached to the ratification documents, it could have no legal effect on the relationship between the parties, even though the United States was fully aware of it. Letter from Secretary of State Root to Dominican Minister Joubert (May 24, 1907), *cited in* 5 Hackworth, *Digest* 125–26.

■ There are important policies behind the refusal to give legal effect to expressions of intent that are not contained in the ratification documents and thereby made part of the formal agreement between the parties. Unless such statements are included in the ratification instruments, it is impossible to determine whether the confirming body (here the Senate) assented to the proposed interpretations. *See Fourteen Diamond Rings*, 183 U.S. at 180, 22 S.Ct. at 61. Here, for example, the Committee Report, which reflects the State Department's section-by-section analyses, was voted upon by the members of the Foreign Relations Committee but not by the full Senate. Even if one were persuaded that the Foreign Relations Committee accepted all of the State Department's analyses, there is no assurance that two-thirds of the full Senate would have. As the Court of Claims cautioned in *Hart*, "[t]o legislate by committee report would raise a [serious] constitutional problem." 585 F.2d 1025, 218 Ct.Cl. at 222. In addition, where the document is not part of the ratification protocol, there is no assurance that the President has given his approval to it. *See New York Indians v. United States*, 170 U.S. 1, 23, 18 S.Ct. 531, 536, 42 L.Ed. 927 (1897).

Perhaps most important, foreign governments dealing with us must rely upon the official instruments of ratification as an expression of the full intent of the government of the United States, precisely as we expect from foreign governments. The Supreme Court confronted this very issue in *New York Indians* where the United States relied upon a provision in the resolution of ratification not included in the President's proclamation ratifying the treaty. The Court held the resolution to be of no effect, stating as follows:

> There is something ... which shocks the conscience in the idea that a treaty can be put forth as embodying the terms of an arrangement with a foreign power or an Indian tribe, a material provision of which is unknown to one of the contracting parties, and is kept in the background to be used by the other only when the exigencies of a particular case may demand it.

*Id.* More recently, Professor Bishop stated the same proposition in more general terms:

> The fundamental basis remains, that no state is bound in international law without its consent to the treaty. This is the starting point for the law of treaties, and likewise for our international law rules dealing with reservations.

Bishop, 103 Receuil des Cours 255.

■ The Senate managed to attach a multitude of reservations, understandings and other modifications to the treaties with Panama as a condition for giving its advice and consent. Each of those instruments was approved by two-thirds of the Senate, presented by the President and accepted by Panama. It would be entirely inappropriate—and inconsistent with the established policy of the United States—to now modify the agreement on the basis of views expressed in committee and never approved by the Senate or presented to Panama for its concurrence or rejection. *See New York Indians*, 170 U.S. at 22–23, 18 S.Ct. at 536.

In sum, nothing presented by defendant supports the finding that Panama and the United States "intended to agree on something different from that appearing on the face of" Article XV of the Implementation Agreement. "Without such a finding the agreement must be interpreted according to its unambiguous language." *Choctaw Nation*, 318 U.S. at 432, 63 S.Ct. at 678.

## C.

### Additional Considerations

The preceding section of the opinion was premised on the court's conclusion that the language of Article XV is clear and unambiguous. Even if one were to take the position that the language of Article XV is ambiguous, there is, nevertheless, much reason to resolve the ambiguity in favor of the interpretation offered by plaintiff.

### 1. The Failure of the United States to Present Evidence of Panama's Intent

Even under the best of circumstances, it is very difficult for the court of one signatory state to understand and appreciate the intentions, interests and motivations of another signatory state. For one thing, states are not always of a single mind; different officials or agencies may hold different views as to what is in the state's interest.[30] It is therefore important to obtain the *official* position of the government in question. Then again, governments are known to change their official position as to how a treaty ought to be interpreted. For example, in *Sumitomo Shoji*, the Department of State initially interpreted the treaty in a manner that supported petitioner; later, it interpreted the treaty consistent with the view offered by respondents. The Supreme Court was not troubled by this lack of consistency. It accepted the official interpretation presented at the time the case was pending for decision. 457 U.S. at 184 n. 9, 102 S.Ct. at 2379 n. 9.

As has been noted, there is little doubt as to the interpretation our government places on Article XV of the Implementation Agreement. However, the record is devoid of any statement of the official Panamanian position. The court has discussed at

length the possibilities for obtaining a clarification of the language in question before the treaty was ratified. *See* pp. 137–142 *supra*. In addition, there has been ample opportunity for the United States to obtain Panamanian concurrence for its views even *after* the treaty went into effect.

One method would have been through the administrative mechanism established by the Implementation Agreement itself. Article II of the agreement provides for the establishment of a Coordinating Committee composed of representatives of the United States and Panama. Paragraph 4 of Article XV authorizes the Coordinating Committee to "establish such regulations as may be appropriate for the implementation of this Article." The Coordinating Committee was in fact established. Agreement Establishing Coordinating Committee, Oct. 1, 1979, United States-Panama, T.I.A.S. No. 10044. Its charter covers a broad array of functions, largely in resolving points of friction that might arise under the Implementation Agreement. The Coordinating Committee has been in operation for about four years but has not issued any regulations pertaining to taxation. Letter from John L. Haines, Jr., Deputy United States Representative to the Coordinating Committee, to Patricia M. McDermott, Librarian, United States Court of Appeals for the Federal Circuit (June 1, 1984) (filed June 12, 1984).

Issuance of regulations that support defendant's position would have been an effective and time-honored method for clarifying language in the Implementation Agreement that the United States claims is ambiguous. Of course, promulgation of any such regulations would require the concurrence of the Panamanian member of the Coordinating Committee. However, if

---

**30.** *Sumitomo Shoji* provides an example of this. In that case, the United States presented an interpretation of the disputed treaty provision from Japan's Ministry of Foreign Affairs (MFA). Brief for the United States as Amicus Curiae at 19–20 & n. 11, *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). The interpretation offered by MFA supported the respondents in that case.

At the same time, Japan's Ministry of International Trade and Industry (MITI) filed an amicus curiae brief which presented a position that "might be understood to support [petitioner's] position on this issue." *Id.* at 20 n. 11. The United States requested that the Supreme Court accept MFA's position because "MFA is the Office of the Government of Japan responsible for interpretation of the Treaty." *Id.*

defendant is correct in its assertion that paragraph 2 of Article XV was meant to exempt Commission employees only from Panamanian taxes, such concurrence should not have been difficult to secure. Nevertheless, defendant has failed to avail itself of this opportunity to clarify the language of the Implementation Agreement.

In addition, defendant might have obtained a diplomatic note or other official indication from Panama as to its view of this matter. Indeed, after expressing considerable skepticism as to defendant's position, Feb. 23 Transcript at 52, 65–66, the court recessed for two weeks to give defendant an opportunity to consider supplementing the record by obtaining an indication from Panama as to its intentions in agreeing to the language of Article XV. At the next hearing on the matter, defense counsel informed the court that no clarification would be requested or obtained from Panama. Mar. 8 Transcript at 3, 8. The court then took the unusual step of inviting an appearance by a more senior attorney to ensure that the implications of this decision were fully understood and appreciated by defendant. Defense counsel and her supervisor appeared at a hearing later the same day and the court once again stated that it found plaintiff's presentation persuasive but urged defendant to supplement the record by obtaining clarification from Panama or through some other means. *Id.* at 26–27, 39–40, 43–45, 49–50. Despite numerous statements by the court that it would decide the case in favor of plaintiff on the record as presented, defendant steadfastly refused the opportunity to supplement the record.

 The notion that defendant can obtain clarifying statements as to the meaning of treaty language while a case is in litigation did not originate with this court.

From time to time, our government has used diplomatic channels to obtain the concurrence of its negotiating partner where ambiguous treaty language has been the subject of litigation. The most recent example of which the court is aware occurred in *Sumitomo Shoji*, 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765. That case involved a suit by female employees against the New York subsidiary of a Japanese trading company; plaintiffs claimed that the company discriminated in favor of Japanese males in promotions to executive positions. Resolution of the dispute turned on interpretation of ambiguous language in a treaty between the United States and Japan. The United States appeared as amicus curiae while the case was pending before the Supreme Court. As part of its presentation, it referred to a cable from the Japanese Ministry of Foreign Affairs to the United States Embassy in Tokyo. The cable gave an interpretation of the treaty that was consistent with the interpretation of our government. *Id.* at 183–84 & n. 10, 102 S.Ct. at 2378–79 & n. 10. The Supreme Court obviously was impressed by the submission and relied upon it. *Id.* Similarly, in *Kolovrat,* the Supreme Court was swayed by an exchange of notes between our government and Yugoslavia's "to the effect that the 1881 Treaty, now and always, has been construed" in the manner suggested by the United States. 366 U.S. at 194, 81 S.Ct. at 926.

Obtaining a diplomatic note interpreting an ambiguous treaty provision makes sense because, after all, the court must divine the intent of *both* parties to the agreement. Of course, it would be entirely plausible for defendant to take the position that such clarifications will not be sought because the practice might unduly burden our relations with other countries.[31] Defendant

31. The court has been exceedingly careful to give appropriate deference to the political branches of our government on matters involving foreign affairs. *See, e.g., Langenegger v. United States,* 5 Cl.Ct. 229 (1984), *appeal docketed,* No. 84–1420 (Fed.Cir. July 10, 1984); *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237 (1983), *appeal docketed,* No. 84–860 (Fed.Cir. Feb. 28, 1984). Even in this case, the court has examined a number of documents on an ex parte, in camera basis to avoid publication of classified material. *See* p. 131 & n. 15 *supra.* However, defendant raised *no* suggestion, however veiled, that approaching Panama on this issue would have adverse foreign policy implications. Indeed, defense counsel represented that

has not, however, taken this position. In fact, it appears perfectly willing and able to obtain such clarifications when it believes it advantageous to do so.

■ It is quite clear from the repeated exchanges on this point between the court and counsel that the decision not to seek clarification from Panama was based exclusively upon counsel's assessment of the litigation risks. *See, e.g.*, Mar. 8 Transcript at 44, 49–50. Under these circumstances, the court must draw a negative inference from defendant's refusal to "produc[e] evidence peculiarly within its possession." *Paccon, Inc. v. United States*, 399 F.2d 162, 185 Ct.Cl. 24, 40 (1968); *accord Borror v. Herz*, 666 F.2d 569, 573–74 (C.C.P.A. 1981); *California-Pacific Utilities Co. v. United States*, 194 Ct.Cl. 703, 718 (1971).[32] The negative inference means, at the very least, that any ambiguity in the language of Article XV must be construed against defendant.

### 2. Established Principles of Treaty Construction

■ Courts are naturally reluctant to give treaties a construction contrary to that proffered by the Executive Branch, although they will do so from time to time. *See, e.g., Johnson v. Browne*, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907); *New York Indians*, 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed. 927. However, the step is never to be taken lightly or without careful consideration of the arguments offered by the United States in support of its position. Yet, the court must also be mindful of the fact that it has special responsibilities in interpreting an international agreement. Aside from its normal duty to uphold the law as written, the court must also safeguard the dignity and credibility of our nation in its dealings with other sovereigns. As the Supreme Court noted a century ago:

Aside from the duty imposed by the Constitution to respect treaty stipulations when they become the subject of judicial proceedings, the court cannot be unmindful of the fact, that the honor of the government and people of the United States is involved in every inquiry whether rights secured by such stipulations shall be recognized and protected.

*Chew Heong v. United States*, 112 U.S. 536, 540, 5 S.Ct. 255, 256, 28 L.Ed. 770 (1884). The Court has therefore urged again and again that treaties be interpreted in a spirit of *"uberrima fides,"* that is, with the most scrupulous good faith. *Tucker v. Alexandroff*, 183 U.S. 424, 437, 22 S.Ct. 195, 200, 46 L.Ed. 264 (1902). More specifically, the Court stated:

As treaties are solemn engagements entered into between independent nations for the common advancement of their interests and the interests of civilization, and as their main object is not only to avoid war and secure a lasting and perpetual peace, but to promote a friendly feeling between the people of the two countries, they should be interpreted in that broad and liberal spirit which is calculated to make for the existence of a perpetual amity, so far as it can be done without the sacrifice of individual rights or other principles of personal liberty which lie at the foundation of our jurisprudence.

*Id.; accord Santovincenzo*, 284 U.S. at 40, 52 S.Ct. at 84; *Jordan v. Tashiro*, 278 U.S. at 127; *see* Vienna Convention art. 26, 63 Am.J.Int'l L. 884 ("[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith"). In addition, the Court has noted that "[w]hen a treaty provision fairly admits of two constructions, one restricting, the other enlarging rights which may be claimed under it, the more liberal interpretation is to be preferred." *Nielsen v. Johnson*, 279 U.S.

---

she had not even discussed the court's suggestion with representatives of the Department of State. Mar. 8 Transcript at 8.

**32.** Of course, defendant alone is in a position to solicit and present the official view of Panama.

Plaintiff has already done more than can be expected in this regard. *See* p. 131 & n. 16 *supra.* Any further efforts by plaintiff might run afoul of U.S. law. *See* 18 U.S.C. § 953 (1982).

47, 52, 49 S.Ct. 223, 224, 73 L.Ed. 607 (1929); *accord Bacardi Corp. v. Domenech,* 311 U.S. 150, 163, 61 S.Ct. 219, 226, 85 L.Ed. 98 (1940); *Jordan v. Tashiro,* 278 U.S. at 127, 49 S.Ct. at 48; *Geofroy v. Riggs,* 133 U.S. at 271–72, 10 S.Ct. at 298–99.[33]

 Even if defendant was under the impression that the provision only limits Panama's right to tax Commission employees, it must be remembered that it was the United States that proffered the language in question to Panama. Any ambiguity in the language must therefore be construed against the United States unless there is convincing evidence showing that both parties interpreted the provision in the same manner. Restatement (Second) of Contracts § 206 (1979).[34] As previously noted, no such evidence exists. Moreover, the United States appears to have had notice of the ambiguity at a very early stage in the process, long before the agreement went into effect. Its failure to alert its negotiating partner of the problem and to obtain a clarification means that the language should be construed as Panama would read it.[35] The court's responsibility to act in good faith toward nations that enter into treaties with the United States requires no less.

### Conclusion

 The question presented in this case is not whether the Implementation Agreement (or indeed the Panama Canal Treaty package as a whole) is a wise policy; policy must be left to the political branches of our government. Nor is the question whether

the agreement signed with Panama is a good deal for the United States; striking bargains with other nations is the prerogative of the President. The only issues presented here are whether the President was acting within the scope of his authority when he signed the Implementation Agreement and, if so, whether the agreement means what it says. For the reasons discussed above, both questions must be answered in the affirmative.

Plaintiff's motion for summary judgment is granted. Defendant's motion for summary judgment is denied.

The clerk is directed to file a copy of this opinion in each of the cases that has been suspended pending final resolution of this case.

---

**33.** In this case, the construction urged by plaintiff is further supported by the rule that laws affecting taxation must be construed strictly in favor of the taxpayer. *Crooks v. Harrelson,* 282 U.S. 55, 61, 51 S.Ct. 49, 51, 75 L.Ed. 156 (1930); *Estate of Renick v. United States,* 687 F.2d 317, 231 Ct.Cl. 457, 463 (1982).

**34.** While this rule of construction is most frequently applied to contracts between private parties, it is equally applicable where the contracting parties are sovereign states. *See, e.g.,* Opinion of Umpire Parker, Mixed Claims Commission, *The Lusitania Cases (United States v. Germany),* Decisions and Opinions 17, 31, *quot-*

*ed in* 5 Hackworth, *Digest* 230. *See also* 5 Hackworth, *Digest* 234.

**35.** One Commentator has noted as follows:

The performance of treaties is subject to an overriding obligation of mutual good faith. This obligation is also operative in the sphere of the interpretation of treaties, and it would be a breach of this obligation for a party to make use of an ambiguity in order to put forward an interpretation which it was known to the negotiators of the treaty not to be the intention of the parties.

A. McNair, *The Law of Treaties* 465 (1961).